LaRamoke, Judge,
delivered the opinion of the court:
This suit is brought by the J. W. Bateson Co., Inc., on its behalf and that of its subcontractor, the Texas Housing Company, for the increased costs sustained by Texas Housing when the defendant terminated the prime contract for the convenience of the Government. Under this court’s decision in Donovan Construction Co. v. United States, 138 C. Cls. 97, cert. denied 355 U. S. 826, a prime contractor may bring suit on behalf of the subcontractor where the contract between those parties does not negate liability for increased costs occasioned by the acts of the Government. The evidence in this case does not show that the contract between Bateson and Texas Housing contained any exculpatory provisions and therefore this action may be maintained.
On February 19, 1953, plaintiff entered into a contract with the defendant, acting through the Public Housing Administration, hereafter referred to as the PHA, to furnish the labor, equipment, materials and services necessary for the construction of 430 individual prefabricated 3-bedroom dwelling units, nine laundry buildings, and one community building at Camp Breckenridge, Kentucky, complete with all utility connections and site improvements. Following the award of the contract, plaintiff issued a purchase order to Texas Housing to furnish and deliver to the site the structures called for under the prime contract. The shipping schedule called for the completion of deliveries by July 17, 1953.
On Friday, May 8, 1953, the defendant, pursuant to a provision of the contract, terminated all work in connection *230 with the project and so notified the plaintiff. Plaintiff in turn notified Texas Housing to cease production with respect to the prefabricated buildings for the Camp Breckenridge project. At this time there were 81 dwelling units erected at Camp Breckenridge and. 44 additional units had been ¡shipped by Texas Housing to the job site. Immediately thereafter, negotiations were entered into between plaintiff and the Government contracting officer for the reinstatement and continued fabrication of the terminated buildings. On Monday, May 11,1958, the defendant ordered the 44 units not yet erected at Camp Breckenridge to be shipped to Camp Pickett, Virginia, where plaintiff had a general contract calling for the erection of 250 units. Plaintiff was also instructed to obtain the remaining 206 units from Texas Housing for shipment to Camp Pickett which left a balance of 99 units to be cancelled. Later, the 99 units were reinstated and shipped to Piketon, Ohio, for installation at another PHA. project there.
Texas Housing completed delivery of the units for the Camp Pickett project on July 29,1953, and made final shipment of the 99 units to Piketon on October 10,1953.
It is plaintiff’s contention that Texas Plousing suffered increased costs in the production of the prefabricated units which increases were caused by the defendant’s termination and partial reinstatement of the contract. It is claimed that the extension of the delivery period from July to October 1953, prevented Texas Housing from maintaining continuous manufacturing operations which resulted in standby expenses and make ready and starting costs. A claim for these costs was presented to the PHA and was denied by the director of the Atlanta field office. The determination of the director was appealed under the disputes clause of the contract to the head of the agency which again resulted in a denial of the claim for work stoppages. Plaintiff was, however, allowed $8,506 on account of storage expense incurred by Texas Housing with respect to the 99 units bound for Piketon. Plaintiff has not received the $8,506 award and there is also due and owing it the sum of $6,296.30 pursuant to change order G-8.
*231 The commissioner of this court who heard, received, and carefully evaluated the evidence in this case, found that plaintiff has failed to substantiate its claim that Texas Housing suffered additional costs due to work stoppages, or otherwise, as a result of any action on the part of the defendant. The details showing a failure of proof by plaintiff on this issue are to be found in the trial commissioner’s findings which we adopt. The action of the head of the agency in denying plaintiff’s claim is final under the circumstances. Volentine and Littleton v. United States, 136 C. Cls. 638; Fehlhaber Corp. v. United States, 138 C. Cls. 571, cert. denied 355 U. S. 877.
Plaintiff is entitled to recover $6,296.30 under change order G-8, and $8,506 on account of the claim of Texas Housing for storage expense. Judgment will be entered for the plaintiff in the amount of $14,802.30.
It is so ordered.
Madden, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
EINDINGS OP PACT
The court, having considered the evidence, the report of Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, J. W. Bateson Company, Inc., is a corporation organized and existing under the laws of the State of Texas with its principal place of business in Dallas and is engaged in business as a general contractor.
Plaintiff brought this suit on its behalf and on that of its subcontractor, the Texas Housing Company, a division of the New Mexico Housing Company, which is engaged in the manufacture of prefabricated houses with its principal plant in Dallas, Texas.
2. On February 19, 1953, plaintiff entered into a contract, No. R(G)DH-DEV-28, with the defendant, acting through the Public Housing Administration, to furnish the labor, equipment, materials and services necessary for the construction of 430 individual, prefabricated, three-bedroom dwelling units, nine laundry buildings and one community building *232 at Camp Breckinridge, Kentucky, complete with all utility connections and site improvements, for a consideration of $2,398,000.
3. Special conditions of the contract specifications provided that work should commence on the date stipulated in the notice to proceed and that groups of dwelling units should be progressively completed, suitable and ready for occupancy, including utilities, sidewalks and driveways, within 130 calendar days for the first 150 units, 180 days for 300 units, and 200 days for the total of 430 dwellings, with an additional 60 calendar days allowed for completing the landscaping. Liquidated damages for each calendar day of delay in completing the work were specified as one dollar a day for each dwelling, $15 a day for other construction and installations, and $10 a day for landscaping. The contract was terminated, as hereinafter reported, and no liquidated damages were assessed.
4. The general conditions of the specifications provided in part:
9. CHANGES IN THE WORK:
(a) Government representatives shall have no authority to alter the terms or conditions of the Contract Documents without written authority from the Contracting Officer.
(b) In determining the value of any change, either additive or subtractive, the Contracting parties are restricted to the use of the three following methods, singly or in combination. Method (1) shall be used to establish the equitable value of the change in every case where it can be fixed prior to performance of the changed work. Method (2), and no other, shall be used to establish changed values for any and all items for which unit prices are set forth in the Contract. Method (3) shall be used only to establish values which are indeterminate otherwise, or in an emergency endangering life or property. The Contracting Officer at the time he issues the written Proceed Order shall, in the case of both Methods 2 and 3, fix a maximum amount to be spent on the work which shall not be exceeded. If additional work remains to be done after that sum has been expended the additional work shall be the subject of a separate written order.
(1) The Contracting parties shall negotiate and agree upon the equitable value of the change prior to issuance *233 of the order, and the order shall stipulate the corresponding lump-sum adjustment of the Contract price.
(2) The applicable unit price shall be applied to the net change in quantity, estimated or actual as agreed, of the item involved.
(3) The order shall direct the Contractor to proceed on a time and material basis, whereupon the Contractor shall so proceed and keep accurately and present, in such form and at such times as the Contracting Officer may require, a correct account of the cost, together with all proper vouchers and supporting papers therefor. Upon completion of the change and agreement upon the total value thereof, the Contracting Officer shall issue a second written order, effecting the equitable adjustment of the Contract price.
(d) For extra work performed the allowances for overhead and profit combined, included in the total cost to the Government, shall be based upon the following schedule:
(1) To the Contractor, for work which he performs with his own forces, not to exceed 15!% of his net extra cost.
(2) To a subcontractor, for work which he performs with his own forces, not to exceed 15% of his net extra cost.
(3) To the Contractor, for subcontract work supervised by him, not to exceed 7%% of the amount due his subcontractor.
These percentages shall be applied to the net additional cost as defined m subsection (e) immediately following. If the net cost value of a change results in a credit from the Contractor or subcontractor, the credit given shall be the net cost without overhead or profit.
(e) The “net cost” as used herein shall mean the difference between all proper cost additions and deductions. The “cost” as used herein may include all items of labor or materials, the use of power tools and equipment, and all such items of cost as public liability and workmens’ compensation insurance, pro rata charges for foremen, social security, old age and unemployment insurance. Among the items to be considered as overhead are insurance other than as mentioned above, bond premiums, supervision, superintendents, timekeepers, clerks, watchmen, small tools, incidental job burdens and general office expense, all other items not included in the cost as herein defined.
(f) Prior to the issuance of any order effecting a firm adjustment in the Contract price the Contractor *234 shall submit to the Contracting Officer a satisfactorily itemized proposal, in multiple-copy form as required, of the quantities and prices used in computing the value of any change that may be ordered.
10. Claims for extra cost :
(a) If the Contractor claims that any instructions by drawings or otherwise involve extra cost or extension of time, he shall, within ten days after the receipt of such instructions, and in any event before proceeding, to execute the work, submit his protest thereto in writing to the Contracting Officer, stating clearly and in detail the basis of his objections. No such claim shall be valid unless so made.
# & i}i # sjs
(d) If, on the basis of the available evidence, the Contracting Officer determines that an adjustment of the Contract price or time is justifiable, the procedure shall then be as provided herein for “Changes in the Work.”
(e) By execution of this Contract the Contractor warrants that he has visited the site of the proposed work and fully acquainted himself with the conditions there existing relating to construction and labor, and that he fully understands the facilities, difficulties and restrictions attending the execution of the work under the Contract. The Contractor further warrants that he has thoroughly examined and is familiar with the Drawings, Specifications, and all other documents comprising the Contract. The Contractor agrees, that by execution of this Contract his failure when he was bidding on this Contract to examine any form, instrument or document, or to visit the site and acquaint himself with conditions there existing, in no wise relieves him from any obligation under the Contract and that he will present no claim based on facts regarding which he should have been on notice as a result thereof.
:Jí ifc % sfc íJí
12. TERMINATION FOR CONVENIENCE OF THE GOVERNMENT :
(a) The Government may terminate this contract in whole or in part at any time by a notice in writing from the Contracting Officer to the Contractor, specifying the date upon which such termination shall become effective and the extent to which the performance of such contract shall be terminated. Termination shall be effective upon the date and to the extent specified in said notice.
(b) Upon receipt of the notice of termination the Contractor shall, except insofar as the notice directs *235 otherwise with respect to this Contract, or, in the event of partial termination, with respect to the part thereof covered by the notice:
(1) Discontinue all work and the placing of all orders for materials and facilities otherwise required for the performance thereof;
(2) Cancel all existing orders and subcontracts to the extent such orders and subcontracts are chargeable to the performance thereof;
(3) Transfer to the Government, in accordance with the direction of the Contracting Officer, all materials, supplies, work in process facilities, equipment, machinery or tools acquired by the Contractor in connection with the performance thereof, and all plans, drawings, working drawings, sketches, specifications and information for use in connection therewith: Provided, That the Contractor may retain any such equipment, machinery and tools if he so elects and will forego reimbursement thereon.
(4) Take such action as may be necessary to secure to the Government the benefits of any rights remaining in the Contractor under orders or subcontracts chargeable thereto to the extent that such orders or subcontracts are so chargeable;
(5) Take such action as the Contracting Officer may prescribe for the protection and preservation of all property in the possession or control of the Contractor, title to which is transferable to the Government under the provisions of this Section.
Should the notice of termination cover only a portion of this contract, the Contractor shall proceed to completion of such portions as are not terminated.
(c) Upon compliance by the Contractor with the above provisions of this Section and subject to deductions for payments previously made, the Government shall pay the Contractor an equitable sum, to be determined by the Contracting Officer, in full settlement of all claims of the Contractor under this contract. In determining this equitable sum, the Contracting Officer shall give due consideration to the percentage of the total contract price which is equal to the percentage of the contract work completed, and to costs of the Contractor incurred as a result of any special factors and conditions entering into the contract work which may exist and to costs incurred as a result of the termination thereof, but the Contracting Officer shall give no consideration to claims for anticipated profits on the portion of the contract work which is not completed.
*236 (d) The Contractor shall furnish, if requested, his complete records, including quantity take-off sheets, cost analysis showing how he arrived at unit prices, complete file on all quotations on materials and subbids, the actual contracts placed for service, materials, and sub-contracts, copy of actual cost performance, together with any other relevant data or documents necessary in the opinion of the Contracting Officer to determine an equitable settlement.
(e) Subject to the approval of the Contracting Officer, the Government shall reimburse the Contractor for expenditures made and costs incurred after the date of termination for the protection of Government property and for such other expenditures and costs as may be necessary in connection with the settlement of this contract.
(f) The obligation of the Government to make any of the payments required by this Section shall be subject to any unsettled claim for labor or material and to any claim which the Government may have against the Contractor under or in connection with this contract, and payments under this Section shall be subject to reasonable deductions by the Contracting Officer on account of defects in materials or workmanship.
(g) The sum of all amounts payable under this Section, plus the sum of all amounts previously paid under this contract, exclusive of costs incurred under Subsection “e” hereof, shall not exceed the total contract price.
* * * * *
(i) Any dispute arising out of termination under this Section shall be decided in accordance with the procedure prescribed, in Article 15 of this Contract.
(j) Upon the making of the payments called for by this Section, all obligations of the Government to make further payments or to carry out other undertakings hereunder shall cease forthwith * * *.
5. On February 5, 1953, Texas Housing Company submitted to plaintiff a written proposal for furnishing and delivering the prefabricated units to Camp Breckinridge, Kentucky, at $2,223 each for the dwelling units and $1,036 for the laundry buildings, in accordance with the specification and drawings for this project.
The proposal contained the following delivery provision:
As our quotation is based on a continuous operation, dwellings will be shipped in accordance with schedule *237 to be furnished by General Contractor. . Dwelling units will be fabricated in accordance with this schedule, and should the General Contractor for any reason at any time not be able to accept dwellings at site in accordance with schedule, they will be placed in plant warehouse, and payments less transportation shall be made in accordance with above terms on receipt of invoice with warehouse receipt attached. Equitable charge will be made for storage.
6. Following the award of its contract, the plaintiff issued a purchase order dated February 27,1953, to the Texas Housing Company to furnish and deliver to the project site 430 individual, three-bedroom, prefabricated houses, nine prefabricated laundry buildings, and one community building in accordance with the plans, specifications, and shop drawings approved by the Public Housing Administration for the defense housing project at Camp Breckinridge for a lump sum price of $961,068.
This purchase order contained all of the provisions substantially as set forth in the proposal by the Texas Housing Company for complete prefabricated units, which excluded the foundation anchor bolts and anchors, roofing and sheet metal, painting, electrical work, plumbing, heating, refrigerators, ranges and shingles. Other provisions, in harmony with the original proposal of the Texas Housing Company, were contained in this purchase order as follows:
The supplier will deliver the houses as scheduled by. the general contractor for the construction of this project. The supplier realizes that the contractor’s contract with the owner carries heavy penalties for failure to complete the project on time. The supplier will closely adhere to the contractor’s schedule in order that the contractor may avoid any penalties.
The supplier will have one of his representatives present at the site during the receipt and erection of the dwelling units to assist the contractor in receiving and distributing the parts furnished by them and to take such measurements as are necessary for the fabrication of such items as skirting, oil drum stands, etc., which will vary as the heights of the buildings above finished grade, and to act as liaison between jobsite and their plant.
*238 The purchase order also contained several options concerning certain materials, which options were to be exercised by the general contractor by March 10,1953.
7. The schedule of shipments provided that deliveries would be made at Morganfield, Kentucky, commencing on April 6,1953, with 58 units to be delivered during tli9 month of April and 32 units a week thereafter, with completion of deliveries by July 17.
The Texas Housing Company had been engaged in the production of precut and prefabricated houses for some 14 years and had produced large quantities of such units for the military services and other Government agencies. Its plant and warehouses, with a railroad siding, occupied an area of approximately 35 acres and had a completely equipped setup to fabricate and deliver the units called for within the delivery period scheduled.
8. On Friday, May 8, 1953, the contracting officer terminated all work in connection with the defense housing project at Camp Breckinridge, Kentucky. The plaintiff notified the Texas Housing Company by letter dated May 8, 1953, as follows:
I am quoting below a telegram which we have received from Mr. Charles L. Levy, Director, Richmond Field Office, Public Housing Administration, in which he advises us that “* * * all operations, Project KY-2D1, Camp Breckinridge, Kentucky, to cease”. We kindly ask that you follow these instructions very carefully and we will advise you more fully when the registered letter referred to in this telegram is received.
“Confirming telephone conversations 5/8 with J. W. Bateson. In accordance with Section 12 of General Conditions of Specifications of Contract No. R (G) DH-DEV. 28, as of this date, 5/8, all operations, Project KY-2D1, Camp Breckinridge, Kentucky, to cease. Please instruct all subcontractors and material dealers accordingly and perform other requirements of said Section 12 of General Conditions. Full instructions following by registered letter.”
• Texas Housing Company notified its suppliers by telegram on May 9, 1953, “stop all shipments contract terminated FOR CONVENIENCE OF THE GOVERNMENT.”
*239 At termination the plaintiff bad erected and under construction 81 dwelling units at Camp Breckinridge. Texas Housing bad shipped some 44 additional completed units, which were then on hand or in transit, to the site and some of the components for all 430 units.
Thereafter, the contracting officer and the plaintiff immediately entered into negotiations for the reinstatement and continued fabrication of the terminated dwelling units and laundry buildings, as hereinafter reported. In addition to the 81 units under construction at Camp Breckinridge, 250 additional units were first reinstated and diverted to Camp Pickett, Virginia, where plaintiff was also the general contractor, and later the additional 99 units were reordered for delivery at other defense housing projects at Piketon, Ohio.
REINSTATEMENT OE 25 0 DWELLING UNITS POR OAMP PICKETT, VIRGINIA
9. By air mail, special delivery letter on Monday, May 11, 1953, the contracting officer wrote the plaintiff in connection with the termination of the Breckinridge project, and the plaintiff in turn transmitted a copy of the same to the Texas Housing Company on May 12, 1953. The contracting officer’s letter confirmed his termination telegram of May 8 and further advised the plaintiff, as follows:
Subsequent to our telegram, we had various conversations on Monday, May' 11, modifying the complete stoppage of work on the project as follows:
1. The 81 dwelling units now erected on the site are to be completed in accordance with all contract requirements.
2. Stop work on all laundry buildings in excess of those needed to serve the 81 dwelling units to be completed.
3. Stop all work on the community building.
4. Stop all work of fabricating in the plant of Dallas Prefab Company on 99 units until utilization of all or a part of the units under that subcontract can be planned.
5. Complete the sewer, water, and electric distribution systems and the project road to the extent necessary to serve the remaining 81 units.
6. Stop work on the sewer lift station until it can be restudied.
*240 7. Limit shipment of equipment ordered (ranges, refrigerators, and space heaters) to the remaining 81 dwelling units and the remaining laundry buildings.
The above changes, in essence, reduce the project from the 430 dwelling units and appurtenances set forth in your contract to a total of 81 dwelling units and appurtenances thereto. In connection with the site work involved, revised drawings will be provided to you showing the work to be completed, among other things, the sewer, water, and electric distribution systems and the road. Any other drawings necessary to completely delineate this change will also be provided.
Since your company is also the contractor for the 250 dwelling Unit Project VA-8D1, Camp Pickett, Virginia, you were instructed as follows:
1. Cancel the contract with the subcontractor for the furnishing of dwelling structures on Project VA-8D1, Camp Pickett, in its entirety.
2. Ee-ship all of the units now on cars at Camp Breck-inridge, or en route thereto, to Project VA-8D1, Camp Pickett, for use on that project.
3. Provide the remaining units necessary for a total of 250 dwelling units at Project VA-8D1, Camp Pickett, from the Dallas Prefab Company.
4. By completing 81 units at Camp Breckinridge, and providing 250 units at Camp Pickett, or a total of 331 units, the balance of 99 units (estimated) from the Dallas Prefab Company are to be cancelled.
It was understood that you would proceed immediately on the basis of these verbal instructions as now confirmed and that you would proceed to furnish us with a proposal to accomplish these various changes, such proposal to be supported by the complete breakdowns necessary for review by the Eichmond Field Office. After receipt and review of this proposal, we will contact you further with respect to the need for either representatives of the Field Office to visit Dallas or for representatives of your firm to come to Eichmond.
10. On May 17, 1953, plaintiff wrote the Public Housing Administration, sometimes referred to as the PHA, that its overhead costs and unit costs of constructing the 81 units at Camp Breckinridge would be considerably greater than the construction of the 430 units originally called for in the contract. It also pointed out that some of the subcontractors and material suppliers might have cancellation charges which would be added to the cost of termination.
*241 Texas Housing Company had no claims from any of its suppliers for stopping delivery of materials for its subcontract with the plaintiff.
The plaintiff’s letter to the Public Housing Administration stated in part:
In general, we are following this procedure at present:
1. Material and fixtures in cars on the track are being left in the cars pending your written disposition order, except that any material in these cars that is required to complete the 81 dwelling units is being unloaded.
2. We have shipped on verbal authorization one truckload of certain excess items from this jobsite to the job-site of Project VA-8D1. This was done so that construction on that project could proceed without further delay.
3. Effective immediately we are providing your Mr. Zopfi'and Mr. Willits with a copy of our instructions to our subcontractors and material suppliers. We ask that we be notified as soon as possible if any of these instructions are contrary to your wishes.
4. As requested by you we are now preparing information so that you can determine the method of disposal of excess items which would be most advantageous to the Government.
5. We are proceeding with the construction of 81 dwelling units, two laundry buildings, and one lift station, and of the site work shown on your site drawings revised May 15. Every effort is being made to complete this work as quickly and as economically as we possibly can.
On the same day plaintiff wrote the Texas Housing Company to expedite the shipment of the remaining components for the construction of the 81 dwelling units and two laundry buildings at Camp Breckinridge and to provide seven copies of an inventory of items already shipped.
On May 22,1953, plaintiff wrote the PHA as follows:
In accordance with your verbal instructions of yesterday, we are proceeding to make shipment of prefabricated houses, chimneys, windows, plumbing materials, etc., now in excess on the subject project, to Project VA-8D1, Camp Pickett, Virginia.
We are pre-paying the freight on these shipments and this cost will be charged against the Camp Breckinridge Project.
*242 11. Pursuant to the instructions contained in the letter of May 11,1958, from PHA and upon oral instructions from the plaintiff, Texas Housing Company submitted a proposal to plaintiff dated May 13,1953, to furnish the 250 dwelling units and seven laundry buildings for the Camp Pickett, Virginia, project for the sum of $547,621, as follows:
206 dwellings @ $2,171 each_$447,226
44 dwellings now at Camp Breckinridge or in transit @ $2,118 each_ 93,192
7 laundry buildings @ $1,029 each- 7, 203
547, 621
This proposal specified that the additional cost of reloading, demurrage charges and additional freight on the 44 units which had been shipped to Camp Breckinridge would be added to the price of $2,118 for these units and that certain components for the 430 units which had been shipped to Camp Breckinridge would be reshipped by the plaintiff to the extent of 250 required at Camp Pickett, Virginia. This letter stated in part:
It is our understanding that you will ship enough materials of the above for completion of 250 units at Camp Pickett, Virginia, and the remainder will become the property of the contractor.
*****
In addition to the excess material at Morganfield above the requirements for 331 units, the material in excess of 331 units which is at our plant, including such labor as is involved, both on the basis of inventory will become the property of the contractor, and we are to be paid for same. Acceptable inventory will be furnished when available.
The above proposal includes all items which now occur to us, but should other items occur which are unforeseeable at this time any additional cost involved will have to be considered at the time it arises.
All figures based on continuous manufacturing of units commencing this date and no unreasonable delay in shipments.
12. By letter of May 24,1953, the Texas Housing Company submitted to plaintiff the status of its purchase order including change orders 1 through 4, and an additional pro *243 posed change, with adjustments for freight and hauling, as follows:

Status of purchase order, including changes 1 through 4:

430 units, 3-bedroom, @ $2,147.30 each-$923,339.00
9 laundries @ $1,023 each- 9,207.00
1 community building- 15,479. 85
948,025. 85
Analysis of proposed change (3-bedroom dwellings):
81 units f. o. b. site, Breckinridge, Ky. @ $2,147.30_$173, 931.30
44 units f. o. b. cars, Morganfield, Ky. @ $2,118_ 93,192.00
99 units f. o. b. ears, Morganfield, Ky. @ $2,118_ 209,682.00
206 units £. o. b. cars, Camp Pickett, Va. @ $2,171_ 447,226.00
Analysis of proposed change (laundry buildings) :
2 units f. o. b. site, Breckinridge, Ky. @ $1,023_ 2,046.00
7 units f. o. b. cars, Camp Pickett, Va. @ $1,029_ 7,203.00
Analysis of proposed change (community building):
1 f. o. b. site, Breckinridge_ 15,245. 05

Add:

Change order No. 5- 2,152.42
Extra freight on Pilot house trucked to site at Breckinridge_ 152.02
Holes already drilled in kitchen cabinets as per verbal agreement with Mr. Burton— 170.50
951, 000.29
Grand total amount of change order- 2, 974.44
The letter specified that additional costs would be added for demurrage and cost of reshipping components from Camp Breckinridge to Camp Pickett, Virginia, and the cost of extra labor and freight for the shipment of small lots of additional items for the 81 dwelling units for construction at Camp Breckinridge.
13. On May 28,1953, Texas Housing Company sent a telegram to plaintiff requesting a change order for the remaining deliveries for Camp Pickett, Virginia, as plaintiff had *244 indicated that the first delivery was scheduled to commence Junel.
By letter of May 29, 1953, plaintiff submitted to PELA, a copy of the above telegram, together with proposals of the Texas Housing Company dated May 13 and 14, recommending the acceptance of the proposals as submitted by Texas Housing.
On June 8, 1953, the contracting officer wrote plaintiff in part:
The claims of your subcontractors and suppliers must be submitted for consideration as a component part of the overall contract and not as individual claims. At such time, due consideration will be given to their equity in accordance with the terms of the contract. You should instruct your subcontractors and material suppliers to proceed with their contracts on the same basis as you have been instructed to proceed by the Government.
The contract documents clearly provide for the payment to the contractor the cost incurred as a result of any special factors and conditions entering into the contract work which may exist and the cost incurred as a result of termination of the contract.
We have reviewed the Texas Housing Company’s proposal for adjusting their contract, and it appears to be equitable. However, we cannot accept it until they have completed their contract and all the records have been audited. It is our understanding that all work in connection with 99 units of the original 430 units is being withheld and that the Texas Housing Company has agreed to complete these units without additional cost to the Government, except adjustment in the freight, and ship them to Piketon, Ohio, provided the Government notifies you to proceed with the completion of these units on or before J une 22,1953.
The contracting officer’s letter of June 8, 1953, was transmitted to the Texas Housing Company by plaintiff’s letter of June 18,1953, reading in part:
* * * The letter pertains to payment for houses you are now furnishing the Camp Pickett project.
Please send all copies of your invoices to our Camp Pickett office. These will be approved by Mr. Boyd *245 and sent to our Dallas office for payment to you. Payment will be made against our Camp Breckinridge project, however. Your invoices should be in accordance with your proposal for furnishing the houses to Camp Pickett. If there is any change in the amount, this can be handled at a later date. At the present time it appears that the PHA will not question the additional freight and the amount of deduction for unloading.
14. On June 5, 1953, Texas Housing wrote J. W. Bateson Company requesting a shipping schedule for the delivery of dwelling units for Camp Pickett, Virginia. This letter stated in part:
We would like to advise that our storage space is now practically 100% full, and we would like to avoid any work stoppage which as you know is very costly.
Prior to June 8,1953, Texas Housing had not received any shipping instructions for deliveries to Camp Pickett, Virginia. Thereafter, from June 10 to July 29, 1953, Texas Housing made shipments of the remaining 206 dwelling units and seven laundry buildings to Camp Pickett, Virginia.
REINSTATEMENT OE 9 9 DWELLING UNITS EOR A DEEENSE HOUSING PROJECT AT PIKETON, OHIO
15. Negotiations were also carried on for the reinstatement and delivery of the remaining 99 dwelling units originally called for in plaintiff’s purchase order for the 430 units required at Camp Breckinridge, Kentucky. These units were reinstated for prefabrication by the Texas Housing Company, together with 51 additional similar units which were required for a defense housing project at Piketon, Ohio. The Texas Housing Company submitted a proposal to J. W. Bateson Company, by letter dated May 16,1953, which reads in part:
In answer to Mr. John A. Wacker’s telephone conversation with our Mr. W. E. Senkel, of May 15, 1953, we are pleased to furnish you the following information: Item 1. 99 — Individual 3-Bedroom Prefabricated
Dwellings, Ky 2-D-l Plans and Specifications, f. o. b. cars, Dallas, Texas, $1,963.30 each — total—$194,366.70 Item 2. 51 — Additional units, Individual 3-Bedroom *246 Prefabricated Dwellings Ky. 2-D-l Plans and Specifications, f. o. b. cars, Dallas, Texas, $1,988.30 each-— total — $101,148.30
The $20.00 increase reflected in Item 2 above, is due to a 7!/2$ per hour increase for common laborers effective May 7, 1953. Also, there has been a $15.50 increase in #1 Common Oak above the firm commitments we have to complete the 99 units. The 7%$ labor increase on the 99 units will be absorbed by this company since we have a firm commitment on 430 units.
* * * * *
If proceed order is given us for the 51 additional units on or before May 22,1953, the above proposal will be firm. This will make it possible to get the required material to our plant during the completion of the 206 units for Camp Pickett and the 99 units which completes your present purchase order, otherwise there would be a work stoppage with an indefinite re-starting load.
If shipment on the 150 units (99 plus 51) can be commenced on or before July 15,1953, there will be no storage charge on these units, in spite of the fact that with our reduced regular production procedure it will mean that approximately 90 of these units will be completed prior to that date. An estimated additional week can be added for the units to reach destination at any locations other than the Southwest.
Our storage rates are based on a minimum of 10 cents per square foot with cost of “storage in” by us and cost of “storage out” by others.
It is impossible at this time to give an acceptable inventory of raw materials, purchased parts, finished components, work in process and special tools. * * *
In regard to' what we would charge to take over the materials; the materials involved are entirely foreign to our commercial production and we would have no use for them.
In connection with the 51 additional units required for the defense housing project at Piketon, Ohio, the Texas Housing Company submitted a separate proposal direct to the Chicago office of PHA, attention of Frank D. Zopfi, under date of May 23, 1953, for furnishing 51 individual, three-bedroom, prefabricated dwellings, delivered f. o. b. cars at Pike-ton, Ohio, at $2,157.30 each, for the total sum of $110,022.30. This proposal provided in part:
*247 DELIVERY
As our quotation is based on a continuous operation, dwellings will be shipped two units per car in accordance with predetermined and mutually agreeable schedule not to exceed eight units per day. Dwelling units will be fabricated in accordance with this schedule, and should the General Contractor for any reason at any time not be able or willing to accept dwellings at site in accordance with schedule, they will be placed in plant warehouse, and payments less transportation shall be made in accordance with above terms on receipt of invoice with warehouse receipt attached. Equitable charge will be made for storage.
ACCEPTANCE
Our completion on the 206 units for Canop Pickett, Virginia, is scheduled for June 26, 1958. Cutting of materials must be accomplished one week prior to manufacture. Therefore, if proceed order is given us by June 22, 1958, it will enable us to have materials in the plant for fifty-one (51) units covered by this proposal before completion of the 99 units, balance of the J. W. Bateson Company, Inc. contract for Camp Breckinridge now contemplated for use at Piketon, Ohio, which could be put in production on June 29,1953. By this proceed order being received on the above mentioned date will involve no work stoppage, which stoppage will add $7,000.00 weekly to the above lump sum quotation.
16. On May 28, 1953, plaintiff wrote the Public Housing Administration advising that approximately 98 percent of the materials for the 99 dwelling units not yet scheduled for erection had been received by the Texas Housing Company and certain items had already been fabricated and shipped to Camp Breckinridge. The plaintiff submitted cancellation charges for these units as follows:
Termination costs Texas Housing Company Contractor's 15 percent overhead and profit
Dwelling units..... $182,805.00 $27,421.00
M and M building.-. 12,758.00 1,914.00
Components shipped to Camp Breckinridge. 4,257.00 638.00
Total $229,793-199,820.00 29,973.00
*248 This letter stated in part:
Texas Housing Company has advised us over the telephone that they would voluntarily cancel the M and M building termination cost of material if the Government would agree to furnish all 150 instead of only 99 units for Piketon, since most of the M and M building material now hi excess could be used in fabricating the additional 51 units.
17. During the period June 1 to 4, 1953, Frank D. Zopfi, of the PHA Chicago office, and John H. O’Donnell of the PHA central office, visited the Texas Housing Company, inspected its plant and warehouses, examined its books and records and conferred with Mr. Senkel, the plant manager, and E. G. Sherfey, the plant project manager.
By personal inspection, and information furnished by Senkel and Sherfey, it was ascertained that Texas Housing had on hand substantially all of the materials required for the fabrication of 305 housing units, 206 of which had been reinstated for delivery to Camp Pickett, Virginia, and the 99 units which had been terminated May 8 but were under consideration for reinstatement and delivery to the defense housing project at Piketon, Ohio. The plant was then producing approximately 25 to 30 units per week of five working days, and approximately 65 units were completed and ready for shipment, although no shipping schedule had been received for the Camp Pickett deliveries up to that time. In addition to its fabricating plant, Texas Housing had three warehouses with adequate storage for its material and completed units and with some additional space available for units being fabricated. Some lumber was stored outside, but not prefabricated sections. Lists of inventories in the several warehouses were furnished the PHA officials.
The purpose of the visit by the PHA officials was to ascertain the plant setup and capacity of Texas Housing to make deliveries of housing units required at Piketon, Ohio. Mr. Zopfi conferred at length with project manager Sherfey and spent much time going over the accounts of the Texas Housing Company. Although Mr. Zopfi did not appear or testify in this case, it is reasonable to conclude that his inspection *249 of records and conferences with the project manager of Texas Housing was for the purpose of determining the ability of that company to deliver the additional 51 units required by the Chicago office of PITA for the Piketon, Ohio, project.
The Texas Housing Company did obtain a separate subcontract with the C. H. Elle Construction Co. and Yitt Construction Co. to furnish the 51 additional prefabricated dwelling units for the Piketon, Ohio, project, which were the same type and size as other dwelling units being furnished to J. W. Bateson Company. These additional units are not involved in the present claim.
18. By letter of June 23,1953, the contracting officer wrote plaintiff as follows:
You are authorized to proceed with the fabrication of the 99 surplus dwellings which were originally planned for use at Project KY-2D1, Camp Breckinridge, Kentucky, on which you were ordered to stop all work for fabricating at the plant of the Texas Housing Company until utilization of all or part of the units could be planned.
These houses should be shipped to Piketon, Ohio, for use on Projects OH-2D1 and OH-2D2. You should contact Mr. William E. Bergeron, Director of the Chicago Public Housing Administration Field Office, and have him advise you the name and address of the contractor for these projects. You should then contact the contractor and have him give you a schedule for the shipment of these units and the exact place he wants them to be shipped. All cost in connection with these units will be charged against the Camp Breckinridge project.
A copy of the above letter was transmitted to the Texas Housing Company on June 25,1953.
On July 6,1953, plaintiff wrote the C. H. Elle Construction Co. and Yitt Construction Co., general contractors on the Piketon project, requesting that the Texas Housing Company be furnished a shipping schedule for the 99 units and by letter dated July 21, 1953, Texas Housing was advised to make shipments of six complete units each working day, commencing October 4,1953.
By letter of August 5, 1953, the plaintiff transmitted to the Texas Housing Company a letter from PHA, dated *250 August 3, advising that the 99 units be shipped to the PHA project engineer, c/o Elle & Vitt Construction Company, Greggs, Ohio, with the first two units to arrive by September 9, 1953, four units on September 10 and 11, and six units for each working day, Monday through Friday, until completed.
Actual shipments from Dallas, Texas, were made from September 3 to October 10,1953, when the 99 additional units were completed.
19. As a result of the reinstatement of all of the prefabricated units originally called for under the J. W. Bateson Company’s purchase order, the Texas Housing Company made shipments from its Dallas plant, as follows:
1953 Destination 3-bedroom dwellings Laundry buildings
March 20-30-. Camp Breckinridge, Ky.
April 1-30.--. Camp Breckinridge, Ky.
May 4-8.. Camp Breckinridge, Ky.
May 21_ Camp Breckinridge, Ky.
June 10-30_ Camp Pickett, Va_ 89
July 1-29_ Camp Pickett, Va. 117
Sept. 3-30._ Piketon, Ohio.. 64
Oct. 1-10_ Piketon, Ohio... 35
430
During the period from April 1 to May 20, 1953, Texas Housing fabricated and delivered 113 dwelling units of similar type to another Government project at Hondo, Texas. Shipments of the 51 dwelling units for the Piketon, Ohio, project, furnished under a separate contract with the Elle Construction Co. and Vitt Construction Co., followed the delivery of the 99 units listed above.
Of the 125 dwelling units originally shipped to Camp Breckinridge, 44 units were later diverted and shipped to Camp Pickett, Virginia, and the 206 additional units for Camp Pickett were shipped direct from the plant of Texas Housing Company.
During the month of August, Texas Housing Company discontinued the regular fabrication of Government housing units, since the deliveries to Piketon, Ohio, were scheduled at 30 a week starting in September 1953. Further, Texas *251 Housing would have required additional banking credit to meet regular production payrolls during August 1953 and the storage of completed units would have carried a higher insurance rate.
By the end of July 1953, Texas Housing Company had the materials on hand for the 99 units and had processed a substantial number of the component parts required. It had also acquired materials for the 51 additional units to be furnished for the Piketon, Ohio, project. However, the fabrication of complete units was contingent upon the shipping schedule for more economical operations.
20. During October 1953, plaintiff and PHA officials negotiated a settlement which culminated in an agreement known as change order G-8. As a result of these negotiations the plaintiff submitted this change order on October 28,1953, for approval, as follows:
Adjusted contract with change orders Nos. 1 to 7_ $2,410, 037.96
Kevised final contract price:
Labor_1_ $44,129.20
Materials_ 1,141,274.11
Subcontract_ 673, 649.45
Payroll taxes and ins. @ 10%_ 4,412.92
1, 863,465. 68
Profit to Bateson Co. @ 10.11% 188,396.38
- 2,051, 862.06
Credit to the Government_ 358,175.90
The final change order increased the credit to the Government for elimination in site improvements and allowed a total credit of $362,546.10, consisting of the following reductions:
For site improvements_$95, 870.20
For dwelling construction- 256,100.90
For dwelling equipment_ 4,000.00
For nondwelling construction___ 6, 575. 00
Total reduction_ 362, 546.10
The revised contract price included the invoices of Texas Housing Company, with profit allowance to the general contractor, as follows:
*252 Texas Housing Company invoices Profit to Bateson Co. © 10.11 percent
(a) Deliveries for Camp Breckinridge construction:
81 Dwelling units @ $2,147.30__ $173,931.30
2 Laundry buildings... 2,164.91
176,096.21 $17,803.33
(b) Deliveries diverted to other projects:
44 Dwelling units @ $2,118.... 93,192.00
206 Dwelling units @ 2,171_____ 447,226.00
99 Dwelling units @ 2,137.42...... 211,604.68
7 Laundry buildings and other charges, less credits...... 19,684.06
771,606.64 78,009.43
Total of invoices. 947,702.85 95,812.76
Change order G-8 provided in part:
The CONTRACT PRICE IS DECREASED THEEE HUNDRED SIXTY-TWO THOUSAND EIVE HUNDRED FORTY-SIX AND 10/l00 DOLLARS ($362,546.10), AND THE CONTRACT TIME IS EXTENDED to October 2i, 1953. The 81 dwelling units erected at Camp Breckinridge and shipment of 250 dwelling units to Camp Pickett, Virginia, were completed within the contract time; however, shipment of the 99 dwelling units to Piketon, Ohio was delayed on orders from Public Housing Administration and the time extension above given covers that necessary to complete the shipment of these units to Piketon, Ohio.
Hi Sj« #
C. All claims against the Public Housing Administration which are incidental to or as a consequence of the aforementioned change are satisfied, except that the right is reserved to the Contractor to make any claim he may have under the Contract for additional expense resulting from claims against the Contractor by Texas Housing Company for that firm’s alleged additional costs resulting from the partial termination of the Contract and the Contractor shall not be prejudiced as to any such claim by the executing of this Change Order.
Settlement has been made with the plaintiff in accordance with the foregoing change order, except for an unpaid balance due plaintiff of $6,296.30.
CLAIM FOR INCREASED COSTS
21. By letter of August 24, 1953, prior to the delivery of any of the dwelling units to the Piketon, Ohio, project, the *253 Texas Housing Company submitted its claim to the plaintiff for increased costs of $117,666.53, consisting of the following items:
1. Delay in the completion of the contract from July 16 to September 30,1953,11 weeks @ $7,000_$77,000.00
2. Make-ready and starting load at 5% of the delivered price on 206 units at $2,171 each, $447,226_ 22, 361. 30
3. Make-ready and starting load at 5% of the delivered price on 99 units at $2,137.42 each, $211,604.58- 10,580.23
4. Storage on 99 units per letter of May 16,1953, July 16 to August 31, 1953, based upon 35,000 square feet at 10¡i per square foot per month- 5,250.00
5. Eemoval from storage of 99 units per letter of May 16, 1953, at $25 each_ 2,475.00
117, 666.53
The plaintiff submitted the above claim to the PHA by letter dated August 25, 1953, which stated, “This invoice comes as a complete surprise to us * * *. Please advise what action, if any, you desire that we take regarding the invoice.”
On September 4,1953, the director of PHA wrote plaintiff that there appeared to be no basis for items 1, 2 and 3 of the claim of the Texas Housing Company, but that items 4 and 5 would appear proper and in accordance with its proposal of May 16, that the only question would be the propriety of the amount claimed, and requested verification of the storage space. The PHA letter was forwarded to the Texas Housing Company by plaintiff on September 9,1953.
On October 7, 1953, the Texas Housing Company furnished plaintiff information concerning its storage space and handling charges under items 4 and 5 of its claim, and by letter of October 7,1953, Texas Housing submitted additional information in support of its claim which was transmitted the same day to PHA. This letter pointed out, among other things, that in excess of $500,000 was required to finance material purchased that remained in the plant over a long period of time, that special jig tables were installed over most of its plant for the fabrication of the Government housing units, according to specifications, that other work could not be accepted during the fabrication and delivery of the Government units, that a representative *254 had to travel between Breckinridge and Pickett, and that one building was cancelled which left materials for it on hand. Plaintiff was advised that records were available to substantiate alleged costs.
22. Under date of October 14, 1953, the director of the Atlanta field office of the Public Housing Administration advised plaintiff of the findings and determination of that office with respect to the claim of the Texas Housing Company, which reads in part:
In summary, it is our conclusion:
1. That there was no delay occasioned to the Texas Housing Company in fabricating the units that would entitle them to any expense for work stoppage beyond that contemplated at the time they made the firm proposal in their letters of May 13 and May 14. There was nothing to prevent continuity of fabrication. This applies both to the 250 units scheduled for Pickett and the 99 units scheduled for Piketon. Any such claim is accordingly denied.
2. Since there was no occasion for delay in fabricating, the only possible claim that might have merit is that for storage and removal from storage, resulting from any authorized extension of shipping dates, and the amount to be allowed will be determined in connection with termination Change Order for the Project.
Change order G-8, reported in finding 20, contained no allowance for costs of storage and removal from storage of the 99 units which were shipped to the Piketon, Ohio, project.
On November 10, 1953, the plaintiff appealed from the determination of the director of the Atlanta field office of PHA upon behalf of the Texas Housing Company.
23. Under date of December 14, 1953, plaintiff submitted to the head of the agency the amended invoice of the Texas Housing Company for additional costs claimed, consisting of the following items:
1. (a) Work stoppage, plant production curtailment and plant shutdown for the period May 8 to June 10, 1953 — S3 days at $1,031.50_$34, 039. 50
(b) Work stoppage, plant production curtailment and plant shutdown for the period July 28 to September 3,1953 — 37 days at $917.02_ 33, 929. 74
*255 2. Make-ready and starting load on 206 units for Gamp Pickett, Va-_$22,284.96
3. Make-ready and starting load on 99 units for Piketon, Ohio, projects_ 9,569. 78
4. Storage on materials and component parts for 99 units from May 8 to September 3, 1953 — 35,000 square feet at 10$ per square foot per month_ 13,559.40
5. Removal from storage of materials and component parts for 99 units at $25 each_ 2, 475.00
Total_,,_ 115,858.38
In connection with the above claim, the plaintiff submitted the gross plant payroll card of the Texas Housing Company for the period January through November 1953 with allocations of labor to deliveries of prefabricated building units for the Hondo, Texas, and Breckinridge, Kentucky, housing projects. Summaries of plant and office overhead expense were also submitted for the periods May 8 to June 10, 1953, and July 28 to September 3, 1953, and explanations were given for each of the five claims stated above.
24. On January 21, 1954, an informal hearing was held in the Longfellow Building, Washington, D. C., at which time the plaintiff and the representatives of the Texas Housing Company were afforded an opportunity to present matters orally in support of the claim to the authorized representative of the head of the department. On February 9, 1954, plaintiff submitted a written memorandum and argument in support of the claim of the Texas Housing Company. Defendant called no witnesses and presented no evidence at the hearing.
As a result of the appeal, H. G. Chapman, director of the construction branch, Public Housing Administration, made the determination for the head of the department and plaintiff was advised thereof by letter dated May 28,1954, which reads in part:
Accordingly, I find and determine that any excess costs accrued by reason of the prefabrication of. the 206 units rescheduled for Project VA-8-D-1 are not the responsibility of the Government and this portion of the appeal is denied.
*256 I can only conclude, and find and determine that the charges for “work stoppage, plant production curtailment and plant shut down” and for “make ready and starting load” as shown in the “Amended Invoice”, both in connection with the 99 units, are wholly the responsibility of the Texas Housing Company because any costs from the foregoing causes could have reasonably been foreseen and avoided and, therefore, were not necessary for the protection of Government property. Accordingly, this portion of your appeal is denied.
In connection with the storage and removal from storage of the materials for the prefabrication of the 99 dwelling units for Piketon, Ohio, it is my view that this claim has merit, at least in part. The original claim presented to the Contracting Officer for decision with your letter of August 25,1953; was on the basis of the Texas Housing Company’s original invoice * * *:
*****
I have investigated the matter of the square feet of storage, the charges of 10 cents per month per square foot of storage and the charge of $25.00 per unit for removal from storage and consider them reasonable and equitable. There remains only the determination of the period of storage. As a maximum there is the claimed period of July 16, through August 31,1953 or 47 calendar days, and as a minimum there is the period between shipments of 36 calendar days. The rate of rental is 10 cents per square foot per month and on the basis of normal business practice the charge of one and one half months made by you is equitable and reasonable.
Accordingly, it is my conclusion and I find and determine that you are entitled to compensation for storage and removal from storage of 99 units in the total amount of $8,506.00 computed as follows:
35,000 sq. ft. of storage @ $0.10 per sq. ft. for 1]/2 months_$5,250.00
Removal of 99 units from storage @ $25.00 per unit— 2,475.00
Total for Subcontractor_ 7, 725.00
General Contractor’s Overhead and Profit @ 10.11% 781. 00
Total allowance_ 8, 506. 00
It is suggested that you contact the Contracting Officer for the procedure to be followed to accomplish the indicated adjustment of your contract amount.
As the other portions of your appeal have been denied on the facts and principles involved, no attempt has been made to verify the amounts claimed.
*257 This determination is issued by me as the duly authorized representative of the Head of the Department in accordance with Section 12(i) of the General Conditions and Article 15 of the Contract and is final and conclusive upon the parties insofar as this Agency is concerned.
The foregoing award had not been made as of the conclusion of the trial in this case.
25. The first item of plaintiff’s claim is represented by all overhead costs during alleged work stoppages, as follows:
Periods Overhead costs Totals
Factory Office
(a) May 8 to June 10,1953.. $22,270.83 $11,768.67 $34,039.50
(b) July 28 to Sept. 3, 1953.. 19,232.10 14,697.71 33,929.81
(a) There is no credible evidence that Texas Housing Company had any work stoppage during the period of May 8 to June 10,1953.
The termination order of May 8, 1953, was reinstated by the defendant with respect to 250 units on the following Monday, May 11, 1953. Texas Housing Company immediately reinstated its orders to its suppliers. Its proposals of May 13 and 14 for the additional 250 units required for plaintiff’s construction contract at Camp Pickett, Virginia, provided only those increased costs to cover additional freight and handling. Plaintiff did not submit these proposals to the defendant until May 29, nor issue any shipping instructions to Texas Housing Company for its construction contract at Camp Pickett, Virginia, until instructed to do so by defendant’s letter of June 8,1953.
During this period Texas Housing completed the shipment to Camp Breckinridge of the remaining components for the 81 dwelling units under construction there, and on May 21 made shipment of two laundry biddings for Camp Breck-inridge. Texas Housing Company also fabricated and shipped 113 similar dwelling units for the Government’s housing project at Hondo, Texas, and made the final shipment to this project during the week which ended May 20, 1953. Production was continued thereafter on the dwelling units for Camp Pickett, Virginia, and by June 4,1953, Texas *258 Housing Company had completed and ready for shipment approximately 65 units, and was fabricating other dwelling units at approximately 25 to 30 per week of five working days.
(b) In its proposal of May 16,1953, for the reinstatement of the 99 additional units of its original contract for 430 dwelling units for Camp Breckinridge, Texas Housing specified there would be no storage costs on these units if shipment could be commenced on or before July 15 and the proposal contemplated that approximately 90 of these units would be completed by that time.
The fabrication and shipment of the 250 units for Camp Pickett, Virginia, was not completed by the Texas Housing-Company until July 29. Some of the component parts had also been completed for the additional units required for the Piketon, Ohio, project and placed in storage. Thereafter, Texas Housing had adequate storage for all of the remaining units for the Piketon, Ohio, project. But it was more economical to complete the fabrication of these units and ship them out immediately than to return the completed parts to storage. Thus, Texas Housing Company discontinued the completion of these units for the Piketon, Ohio, project until they could be shipped out in accordance with the shipping schedule specified by the defendant.
The work stoppage during the month of August 1953 was not the result of any order or action of the defendant, but was the result of the determination of Texas Housing Company on its own account to avoid additional handling of putting completed parts in storage and to avoid borrowing additional funds to meet production payrolls during this period.
26. The second and third items of plaintiff’s claim constitute alleged costs of plant labor for make-ready and starting load for the 206 additional units at Camp Pickett, Virginia, in the sum of $22,284.96, and for the 99 additional units at the Piketon, Ohio, project in the sum of $9,569.78. Since there was no actual work stoppage during the period May 8 to June 10, 1953, when the 206 dwelling units were in production, and no substantial evidence that the defendant was in any manner responsible for work stoppage during August 1953 when the 99 dwelling units were ready for fabri *259 cation, there is no satisfactory basis for these items of the claim. In any event there is no satisfactory evidence that increased costs were incurred in the make-ready, starting load or otherwise.
The alleged increased costs of plant labor are computed by Texas Housing Company upon the difference in fabrication costs during the period the above units were shipped, as compared with the average costs for shipments during a three-week period in July 1953, described as a “leveling off cost” period. Such costs were applied upon the units shipped, rather than the units fabricated.
The plant labor costs of Texas Housing Company for dwelling units shipped, without regard to the nine laundry buildings fabricated during the same period, were incurred in the following periods:
1953 periods Plant labor Dwelling units shipped
Units Per unit
(1) March 20 to May 20:
Por Breckinridge order. 125
Por Hondo, Tex., project. 113
Total. $127,462.98 238 $535.56
(2) May 21 to July 29:
Por Camp Pickett, Va. 206
Units burned. 2
Total... 75,510.92 208 363.03
(3) July 30 to October 9:
Por Piketon, Ohio, project. 31,153.47 99 314.69
Total. 234,127.37 545 429.59
The diminishing costs, as applied to units shipped during the latter periods, resulted from the fact that practically all of the millwork and many of the component parts for the original order of 430 dwelling units were fabricated in advance. The workers engaged upon millwork and certain other parts were thereafter laid off and only those retained necessary for completing the large panels and other parts required for the shipment of entire units.
During the last two periods of the above shipments, Texas Housing Company was also engaged in fabricating 51 similar units for the Elle Construction Co. and Yitt Construction Co. for delivery to Piketon, Ohio. The shipment of *260 these units was made after October 9, 1953, although much of the fabricating cost is included in the plant labor for the period prior to October 10,1953.
There is no true relationship between the per unit allocation of labor costs to the units shipped and the actual labor costs of such units. Labor costs applied immediately before shipment represented finishing-up costs, and the lowering of costs for units shipped depended upon the proportion of component parts completed during the earlier period.
The Texas Housing Company’s production records for 1953 had been destroyed so that verification of plant labor costs, as allocated in the books, could not be verified. Current plant production records provide for labor allocations to projects only and do not allocate such costs to the various component parts, so that the cost of millwork and component parts fabricated in advance could not be separately determined in any event.
There is no satisfactory evidence that the Texas Housing-Company’s fabricating costs were increased to any determinable degree for units shipped to Camp Pickett, Virginia, or Piketon, Ohio, by reason of the shipping schedules furnished for deliveries to these projects.
27. The plaintiff now claims storage on component parts and materials for 99 dwelling units for the period from May 8 to September 3,1953, in the sum of $13,559.40.
In its proposal of May 16, 1953, for the reinstatement of these units, Texas Housing Company specified that if deliveries to Piketon, Ohio, could commence by July 15, 1953, there would be no storage charges on these units. Actual deliveries were commenced September 3,1953. Its proposal specified a unit price of $1,963.30 f. o. b. Dallas. It was paid a delivered price of $2,137.42 per unit.
Upon appeal, the plaintiff was awarded an allowance for storage of these 99 units for a period of one and one-half months, together with the cost of removal of these units from storage, in the total sum of $8,506.
The plaintiff has presented no evidence which could justify a determination of any additional storage expense for these 99 units.
*261 28. There remains unpaid the sum of $6,296.30 under change order G-8, reported in finding 20, and the award by the head of the department in the amount of $8,506 on account of the claim of the Texas Housing Company, or a total amount of $14,802.30.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States fourteen thousand eight hundred two dollars and thirty cents ($14,802.30).