**ABE L. GREENBERG CO., Inc.**
v.
**The UNITED STATES.**
No. 196–59.

United States Court of Claims.
March 7, 1962.

No appearance for plaintiff.

Sheldon J. Wolfe, Washington, D. C., with whom was Asst. Atty. Gen., William H. Orrick, Jr., for defendant.

JONES, Chief Judge.

This case was submitted to us without oral argument for our decision.

Plaintiff Abe L. Greenberg Company, Inc., is a Pennsylvania corporation engaged in the business of manufacturing clothing. In its petition herein, plaintiff seeks to recover, in Count I, the amount of a reduction in contract price effected by defendant because of plaintiff's failure to use the type of exterior shipping container allegedly required by applicable specifications. Plaintiff also seeks to recover, in Count II, the difference between the unit price awarded it for the Small Business set-aside of a procurement and the highest unit price awarded for the advertised portion of the same procurement.

### Count I

On January 13, 1958, defendant's Military Clothing and Textile Supply Agency, Philadelphia Quartermaster Depot, issued an invitation for bids pursuant to which the Government sought to procure a quantity of jacket liners. On the basis of its responsive bid to defendant's invitation, plaintiff was awarded a contract on March 13, 1958, styled DA–36–243–QM(CTM)–1902. This contract called for the manufacture and delivery of 102,400 jacket liners, man's, wool pile, 26.4 oz., moth repellant, at a unit price of $8.35, or a total contract price of $855,040, f. o. b. destination.

In connection with the delivery of the finished jacket liners, the contract provided, *inter alia*, that packaging and packing be accomplished in conformity with section 5 of Military Specification MIL–L–4889 (USAF), dated November 15, 1954. That section provided, as is pertinent, as follows:

"5. PREPARATION FOR DELIVERY

"5.1 Packaging.—Only identical items and quantities will be packaged in each unit container. Fold liner in accordance with good commercial practice to measure approximately 24 by 16 inches. Reverse nest two liners in a polyethylene bag .003 guage, flat size 23 x 34 inches, heat seal closure (see 5.3). Over pack in a fiberboard box, RSC 200 pound test, conforming to Specification LLL–B–631. Tape seal carton in accordance with Specification UU–T–111. Outside dimensions shall be 24 by 16 by 8 inches. This shall be the unit container.

"5.2 Packing.—

"5.2.1 Domestic Shipment.—For domestic shipment five unit containers (10 liners) shall be packed in an exterior container conforming to Specification NN–B–621, NN–B–631, PPP–B–601, or MIL–B–10377. Inside dimensions shall be approximately 40 by 24 by 16 inches."

Pursuant to the election afforded by paragraph 5.2.1 of the specification, plaintiff chose to use a wirebound wooden box as the exterior container for its shipments under the contract. The precise type of box selected by plaintiff for use was one of the three types authorized by Federal Specification PPP–B–585, which had superseded Federal Specification NN–B–631 mentioned in paragraph 5.2.1 of Military Specification MIL–L–4889 (USAF).

Federal Specification PPP–B–585 purported to identify the types of loads which would govern the choice among the three types of wirebound wooden boxes covered by it. The pertinent provisions read as follows:

"1.2.3 *Types of loads.*—The boxes covered by this specification shall be furnished for the shipment of type 1 (easy), type 2 (average), or type 3 (difficult) loads, as specified. (See 6.2.) The type of load applicable to each procurement shall be specified. (See 6.3.)

\* \* \* \* \* \*

"6.2 Types of loads.—Type of load determines weight and size limitations applicable. The type of load falls in one of the following categories:

"*Type 1 (easy load).*—Articles of moderate density packed in and completely filling one and only one fiberboard box, which, in turn, completely fills and supports all the faces of the outer shipping box into which it is packed.

"*Examples:* Canned and boxed articles which are prepacked in fiberboard boxes and completely fill the outer shipping box.

\* \* \* \* \*

"*Type 2 (average load).*—Contents are moderately concentrated articles which may either be packed directly into the outer shipping box or subject to an intermediate stage of packing, such as wrapping or packing in a chipboard or fiberboard box or protected by other types of suitable interior packing. The contents or interior packing provide support for all the faces of the shipping box.

"*Examples:* Goods in metal cans which are not packed in an inner container, bottles individually cushioned, hardware in cartons.

"*Type 3 (difficult load).*—Contents are articles which are highly concentrated, require a high degree of protection, or do not support the shipping box."

Although Federal Specification PPP–B–585 explicitly stated in paragraph 1.2.3 that the type of load applicable to each procurement would be specified, the type of load was not so specified in the

invitation for bids for the jacket liners here involved. There is no dispute as to this.

As a result of the failure to specify the type of load applicable to this procurement, plaintiff advised the contracting officer that it proposed to use type 1 (easy load) containers in making its deliveries under the contract. However, on April 22, 1958, plaintiff was notified that it was required to use type 2 (average load) containers, pursuant to the requirements of Specification PPP–B–585. These latter containers were heavier and more costly than the type 1 containers plaintiff proposed to use. The contracting officer took the position that, since plaintiff was required by Specification MIL–L–4889 (USAF) to place five unit containers in one exterior shipping box without further intermediate packing, the type 1 containers were inappropriate for these shipments.

Plaintiff protested this determination and, thereafter, requested permission "without prejudice" to use the type 1, containers it had already purchased. Plaintiff offered to reduce the contract price by $0.35 per unit if this permission were granted, subject to its right to make claim for the difference.

By modification No. 3, dated September 23, 1958, the contract price was reduced by a total of $3,584 in consideration of the contracting officer's acceptance of 10,240 type 1 containers pursuant to plaintiff's proposal. It is this amount which plaintiff seeks to recover under Count I of its petition.

Plaintiff subsequently appealed the contracting officer's determination and the modification in the contract to the Armed Services Board of Contract Appeals. In a decision rendered on March 31, 1959, the Board denied plaintiff's appeals and stated:

"When consideration is given solely to the language used to describe examples of type 1 loads, particularly to the words relating to prepackaging in *boxes* and the complete filling of an outer *box*, it is apparent that some confusion might arise. In our opinion, however, when the provisions are read as a whole they could not reasonably be construed to mean that five boxes of liners could be placed in a type 1 box without first being prepacked in a single fiberboard box. * * * We have found that the box specification classified this [load] as a type 2 load. In our opinion these two provisions [paragraph 5.2.1 of Specification MIL–L–4889 (USAF) and paragraph 6.2 of Specification PPP–B–585] read together constituted an adequate specification of the type of load."

The record indicates that, between October of 1956 and the date of the award of the contract here involved, plaintiff had completed three other contracts with defendant. Two of these contracts were for the manufacture and delivery of cotton utility trousers and one was for the manufacture and delivery of white bakers' and cooks' coats. Each of these contracts required, in a manner generally similar to the procedures prescribed in the instant contract, that the finished garments be folded, nested in polyethylene bags and packaged in cartons, several of which, in turn, were to be placed in wooden exterior containers of the type covered by Specification PPP–B–585. Each of these contracts explicitly required that type 1 exterior containers be used, in spite of the fact that several cartons were to be placed in a single exterior container. These three contracts are not in issue here, but are cited as bearing on the interpretation of similar specifications in recent contracts between the same parties.

In performing the instant contract, plaintiff also used the type 1 exterior container, as we have indicated, and packed five fiberboard cartons to a container, in the same general manner that it had packed the trousers and coats in performing the prior contracts.

It is apparent that the primary cause of this dispute was defendant's failure.

for whatever reason, to specify the type of load applicable to this procurement after it had undertaken to do so. Nonetheless, this alone does not preclude defendant from judgment in its favor, if it is found that the contract documents, taken as a whole, adequately specified that type 2 exterior containers were required for this shipment.

As might be expected in this sort of case, both parties can, and do, point to specific language in the applicable specifications in support of their respective positions. Thus, plaintiff stresses the terminology of the example given in connection with the statement of requirements for type 1 loads in paragraph 6.2 of Specification PPP–B–585 to show that it was, in fact, required to use type 1 exterior containers. In particular, plaintiff points to the fact that the example has reference to *boxed articles* which are prepacked in fiberboard *boxes* and completely fill the outer shipping *box*. Clearly, says plaintiff, this language fits the shipments here in issue because the jacket liners enclosed in polyethylene bags were prepacked in five fiberboard *boxes* which completely filled the type 1 load *box* into which they were then placed.

Defendant, on the other hand, points to the statement of requirements for type 1 loads as set forth in paragraph 6.2 of Specification PPP–B–585, particularly the reference to articles packed in and completely filling *one and only one fiberboard box, which, in turn, completely fills and supports* all the faces of the outer shipping box into which it is packed. Defendant contends this language, taking into account the fact that plaintiff was required to pack five fiberboard cartons into each exterior container by virtue of paragraph 5.2.1 of Specification MIL–L–4889 (USAF), precluded plaintiff from using the type 1 load containers. Therefore, defendant's position is that the contract documents adequately specified type 2 load containers since the type 3 load containers, the only remaining choice available to plaintiff in addition to the type 2 containers, were obviously inapplicable to these shipments.

■ We must, in resolving this issue, look to the contract documents as a whole, and not overemphasize any particular words or phrases to the exclusion of others. We agree that the provisions relied upon by the parties lend some credence to their respective positions. However, when these provisions are considered together, as they must be, it is apparent that we can reach but one conclusion. That is to say, it appears to us that the meaning of these provisions is not so clear and unambiguous as to put the contractor on notice as to what was expected of it. On the contrary, there appears to be some inconsistency between the statement of requirements for type 1 loads set forth in paragraph 6.2 of Specification PPP–B–585 and the example given immediately thereunder for the purpose of making the statement more meaningful. Instead of accomplishing this result, the example merely serves to confuse the matter. The contentions of the parties bear this out, for neither of them offers a reasonable explanation of how these provisions can be harmonized short of ignoring one provision or the other. Confusing at best, we cannot say that, as a matter of law, these provisions are subject to only one reasonable interpretation. Consequently, we cannot hold, as defendant would have us do, that plaintiff was adequately apprised of the fact that it was required to use type 2 load containers in performing this contract.

■ This is especially true as to this particular contractor, who had prior experience in packing several unit containers, without further intermediate packing, into a single type 1 load container under previous contracts with defendant. It was expressly required to do so by the very terms of those contracts. As a result, we feel that this experience doubtless colored the interpretation it gave to the specifications here in issue. In this connection, it should be understood that we do not mean to imply that the previous contracts may be taken as proof of how these parties agreed to interpret the disputed specifications or

even that plaintiff's interpretation herein is necessarily the correct one. What we are saying is that, faced with confusing and ambiguous directions which did not specify clearly which type of exterior container it was required to use, plaintiff gave meaning to them which, in the light of its experience under somewhat similar contracts, was not unreasonable or in any way improper in the circumstances.

In view of the foregoing, it is our conclusion that plaintiff is entitled to recover the amount sought in Count I of its petition.

## Count II

On November 14, 1958, the Military Clothing and Textile Supply Agency, Department of the Army, issued an invitation for bids pursuant to which the Government sought to procure 440,100 pairs of shorts, men's, cotton, uniform twill, 8.2 oz., khaki, shade No. 1. The quantities to be delivered, all f. o. b. destination, were 252,000 pairs to Schenectady General Depot, 61,000 pairs to Memphis General Depot, 83,400 pairs to Atlanta General Depot and 43,500 pairs to Utah General Depot. The invitation set forth the varying monthly quantities to be delivered to the four destinations as well as the varying size ranges.

On the basis of its lowest responsive bid to defendant's invitation, plaintiff was awarded a contract, styled DA–36–243–QM (CTM)–3561, on December 31, 1958. This contract called for the delivery of 61,000 pairs of shorts at a unit price of $2.61 f. o. b. Memphis General Depot and 83,400 pairs at a unit price of $2.63 f. o. b. Atlanta General Depot.

Another contract was awarded at the same time to the Steinway Clothing Company (which is unrelated to plaintiff and not a party to this suit) as the lowest responsive bidder for the quantities to be delivered to the remaining two destinations. This contract called for the delivery of 252,100 pairs of shorts at a unit price of $2.70 f. o. b. Schenectady General Depot and 43,500 pairs at a unit price of $2.74 f. o. b. Utah General Depot.

In addition to the advertised portion of the procurement, indicated above, the invitation also provided that another quantity of 440,100 pairs of shorts was being reserved for small business under a partial Small Business set-aside, pursuant to the Small Business Act, 72 Stat. 384, amending 67 Stat. 232, 15 U.S.C.A. § 631 et seq. It was further stated that negotiation for the award of this set-aside portion of the procurement would be conducted only with responsible small concerns who submitted responsive bids on the advertised portion at a unit price within 120 percent of the highest award made.

After the award of the advertised portion of this procurement, as indicated above, negotiation for the set-aside portion was commenced on January 5, 1959. Plaintiff was invited to offer a proposal at $2.61 each for 61,100 pairs of shorts to be delivered f. o. b. Memphis General Depot and at $2.63 each for 83,400 pairs to be delivered f. o. b. Atlanta General Depot. It was notified that the contracting officer intended to award to the Steinway Clothing Company, at $2.70 each, 252,100 pairs to be delivered f. o. b. Schenectady General Depot and 43,500 pairs, at $2.74 each, to be delivered f. o. b. Utah General Depot.

Plaintiff immediately protested the proposed award to the Comptroller General of the United States. Plaintiff asserted that, being the lowest bidder under the advertised portion of the procurement ($2.61 each for the 61,000 pairs to be delivered f. o. b. Memphis General Depot), it was entitled under the applicable regulations to the award of the entire set-aside portion of the procurement at the highest unit price ($2.74) of the advertised portion.

While this protest was still pending, plaintiff did submit a proposal for the set-aside portion of the procurement allocated to Memphis, at a unit price of $2.61, and the portion allocated to Atlanta, at a unit price of $2.63, on the same terms and conditions as the award already made to it under the advertised part of the procurement. However,

plaintiff asserted a reservation of its right to seek a higher unit price for the entire set-aside portion in accordance with its protest to the Comptroller General.

On January 23, 1959, plaintiff was awarded a contract, styled DA–36–243–QM(CTM)–3661, for the delivery of 144,500 pairs of shorts under the set-aside portion of the procurement. This contract embodied the identical unit prices, destinations, terms and conditions set forth in its proposal to the contracting officer, as indicated above.

The Comptroller General denied plaintiff's protest in a decision rendered March 10, 1959.[1] It was held that the award of the set-aside portion of the procurement to plaintiff and the Steinway Clothing Company had been made in full compliance with the applicable regulations and, as a practical matter, in the only feasible way it could be made.

Plaintiff's right to proceed with performance under the contract for the set-aside portion was terminated on July 21, 1959, as to 100,000 pairs of shorts because of its failure to meet the initial delivery schedule. Plaintiff was directed to complete performance as to the balance of 44,500 pairs and, within the 2 percent variation in quantity clause of the contract, it did ultimately deliver 17,001 pairs f. o. b. Memphis General Depot and 26,887 pairs f. o. b. Atlanta General Depot.

The award of the set-aside portion of the procurement here involved was governed by Armed Services Procurement Regulation 1–706.6 and Paragraph 30–714 of the Army Procurement Procedure. These provisions are set out in detail in findings 17 and 18.

■ We agree with plaintiff that a literal reading of Armed Services Procurement Regulation 1–706.6 (as set out in finding 17) would seem to support its position. However, this Regulation has never been applied in the manner contended for by plaintiff and we cannot

overrule established administrative practice without sound reason. Plaintiff does not purport to offer us any such reason, and our consideration of the factors involved in reaching such a result leads us to the conclusion that the Regulation was not intended to be, and should not be, literally applied.

Armed Services Procurement Regulation 1–706.6 refers the contracting parties to the advertised portion of the procurement for the purpose of determining the unit prices for the set-aside portion of the procurement. In order to give effect to plaintiff's contention, we would of necessity have to treat the entire advertised portion as a single unit in all events. This we cannot do. The advertised portion of this particular procurement involved deliveries of varying quantities of shorts f. o. b. to widely separated locations. Moreover, the invitation called for varying size ranges for the different destinations as well as varying monthly delivery schedules. These are variables which would obviously have some effect on bid prices but the extent of that effect may not be readily ascertainable in any given case. For example, the freight costs included in the bid prices, since all of these deliveries were f. o. b., would vary from bidder to bidder depending upon such factors as location, destination, available transportation facilities, and the quantity and frequency of shipments. Because of these variables, we are constrained to hold that it is entirely proper to treat separate destinations as separate matters both for the purpose of determining the lowest responsive small business bidder on the advertised portion of the procurement and the unit prices to be awarded for the set-aside portion of the procurement. To do otherwise would be to remove any basis from which the contracting agencies could evaluate bids by any common criterion and would, in effect, result in unwarranted premiums to some contractors. As a result, it is our conclusion that the practice followed by the Quar-

1. See finding 23.

termaster Corps in determining the unit prices for set-aside portions on the basis of individual destinations is entirely reasonable and logical in the circumstances.

The Congress has in recent years emphasized the policy of having a portion of supply contracts, wherever practicable, allotted to small business concerns and groups. These regulations were a reasonable effort to carry out that policy.

Plaintiff's claim for relief under Count I of its petition will be granted, and its claim for relief under Count II will be denied with the petition as to that count dismissed. Judgment will be entered to that effect in the amount of $3,584.00.

It is so ordered.

WHITAKER, LARAMORE and DURFEE, Judges, concur.