**SOUTHERN CONSTRUCTION COM-
PANY, Inc.**

v.

**The UNITED STATES.**

No. 385–64.

United States Court of Claims.
July 15, 1966.

Raymond R. Robrecht, Jr., Atlanta, Ga., attorney of record, for plaintiff. Robert J. Berghel and Fisher & Phillips, Atlanta, Ga., of counsel.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

PER CURIAM.

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make recommendation for conclusions of law on plaintiff's motion and defendant's cross-motion for summary judgment. The commissioner has done so in an opinion and report filed on January 28, 1966. Plaintiff has filed no exceptions to or brief on this opinion and report and the time for so filing pursuant to the rules of the court has expired. The case is submitted to the court without oral argument. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Therefore, plaintiff's motion for summary judgment is denied, defendant's cross-motion is granted and plaintiff's petition is dismissed.

Commissioner Hogenson's opinion,* as modified by the court, is as follows:

This is a suit on a bid contract awarded by U.S. Army Engineer District, Savannah, Georgia, Corps of Engineers, to plaintiff, dated August 17, 1959, designated No. DA–09–133–Eng–3688, pursuant to which plaintiff, a Georgia corporation engaged in the construction business, undertook for the contract price of $813,723.09 to furnish all labor, equipment, and materials and to perform the work required to rehabilitate and improve an existing Wherry housing project, located at Fort Benning, Georgia, in strict accordance with the provisions, specifications, schedules, drawings and conditions of the contract. The contract performance involved 800 dwelling units in 370 buildings of 6 types, a shopping center, and 8 utility buildings. The contract provisions, specifications and conditions hereinafter discussed and quoted, were existing standard forms previously drawn by defendant and provided to plaintiff in accordance with the invitation for bids.

On behalf of its subcontractor, Bailey-Lewis-Williams of Georgia, Inc., a Georgia corporation engaged in the painting business, plaintiff seeks a judgment in the sum of $64,792.40 for increased costs allegedly incurred by such subcontractor because defendant required painting of certain previously unpainted interior surfaces of the buildings, which plaintiff contends was contrary to the contract specifications.

This case is before the court on cross-motions for summary judgment. With the approval of the trial commissioner, the parties have agreed to present only the issues relating to liability, reserving the determination of amount of recovery, if any, for further proceedings. In support of their respective motions, the parties rely on their respective pleadings and briefs filed herein and on a duly certified copy (filed herein) of the record of proceedings of the Armed Services Board of Contract Appeals (ASBCA No. 8300) on plaintiff's appeal from the adverse decision of defendant's contracting officer on plaintiff's claim. After hearing the testimony of two agents of the

---

* The opinion and recommended conclusion of law are submitted pursuant to order of the court under Rule 54(b). The facts are stated in the opinion.

subcontractor, receiving in evidence proffered exhibits, and considering the briefs of the parties, the Board in an analytical decision denied plaintiff's appeal. 1963 BCA Decisions 18,422.

Included within the work to be performed under the contract were various repairs, replacements and improvements of mechanical and structural items, as well as electrical equipment and wiring systems, and extensive interior and exterior calking and painting. The only performance in dispute is that part of the interior painting which included the painting of unpainted plaster ceilings throughout the dwelling units; unpainted plaster ceilings and walls of clothes closets of the dwelling units; and unpainted plaster walls and ceilings of the storage rooms of F- and H-type dwelling units.

The opening of bids on the prime contract apparently occurred as scheduled by the defendant's invitation for bids at 2:00 p. m. on August 13, 1959. Prior to that time, the subcontractor Bailey-Lewis-Williams had learned of the project through a trade bulletin. From the publisher thereof, the subcontractor's estimating engineer, Mr. Thomas R. Allen, Jr., then obtained the use of a copy of the project plans and specifications, and from them made a "take-off" of the painting required, which as to interior painting of plaster surfaces, was a computation of the square footage of flat areas to be painted. On this basis he then estimated the hours of labor and gallons of paint required, to which he proceeded to apply prevailing costs, with allowances for overhead, profit, and other incidental costs. He assumed that all the plaster surfaces had been previously painted, and included all such surfaces in his estimates. Accordingly, he provided for only one coat of paint, as he recognized that the specifications required only one coat on previously painted surfaces, whereas he understood that if construed to require painting of unpainted plaster surfaces, if any, the specifications to that extent provided for two coats. These estimates were completed

on August 11, 1959, 2 days before the bid opening date.

The outstanding invitation for bids, on which plaintiff's contract is based, called for unit prices on interior painting at a specific price per building for each of six types of dwelling buildings. Under its responsive unit price schedule, contained in its bid accepted by defendant, plaintiff ultimately received a fixed amount per building for all interior painting specified for such building, regardless of what surfaces were required to be painted or how many coats were to be applied.

To conform to the manner of bidding under the required unit price schedule, the subcontractor translated its estimates on interior painting into unit prices on the form prescribed by the invitation, and distributed its unit-price proposal to the competing general contractors, without disclosing its computation of square footage to be painted, gallonage of paint to be applied, or labor to be used.

On August 12, 1959, the day before the bid opening, Mr. Allen visited the project site and inspected the buildings, and discovered that certain plaster surfaces in the dwelling buildings, as above-described, were unpainted. These surfaces had been left unpainted when the project was built some 8 years previously. In the evening before the bid opening date, he revised his estimates downward to reflect the exclusion of the square footage of surfaces he had discovered to be unpainted, as he interpreted the specifications as not requiring the painting of previously unpainted plaster surfaces. That same night, he submitted to plaintiff a price quotation based on his revised estimate, showing a lump sum less than his previous quotation, but without any revision of unit prices.

After the bid opening on August 13, 1959, defendant awarded plaintiff the prime contract which was executed by plaintiff and defendant on August 17, 1959. Shortly thereafter, plaintiff and its subcontractor entered into a subcon-

tract in the total sum of $234,600 for the performance of all of the painting required by the prime contract. On September 15, 1959, Mr. Allen for the subcontractor supplied to plaintiff a breakdown of the subcontract price of $234,600. In addition to unit prices provided for all other painting, he stated a unit price per building for the interior painting of each of the six types of dwelling buildings, and the computed total sum for each of the six types.

Mr. Allen's work sheets on his estimates prepared August 11, 1959, and his breakdown of the subcontract price, dated September 15, 1959, both of which were in evidence before the Board, revealed for interior painting a unit price per dwelling building of each type and a total price for each type, as follows:

*Interior Painting of Dwelling Buildings*

| Type of building | Number of each type | August 11, 1959 | | September 15, 1959 | |
|---|---|---|---|---|---|
| | | Per building * | Total for type | Per building | Total for type |
| A | 42 | $544 | $22,854 | $488 | $20,496 |
| B | 190 | 339 | 64,533 | 302 | 57,380 |
| C | 25 | 679 | 16,983 | 612 | 15,300 |
| D | 13 | 743 | 9,669 | 670 | 8,710 |
| F | 40 | 154 | 6,177 | 140 | 5,600 |
| H | 60 | 186 | 11,200 | 163 | 9,780 |
| Totals | | | | 131,416 | | 117,266 |

\* The figures in this column were not actually set forth in Mr. Allen's work sheets of August 11, 1959, but each is obtained by simply dividing the total amount for the pertinent type of buildings by the number of buildings in that type.

These same documents show that Mr. Allen on the same two occasions computed the unit prices for the exterior painting of the dwelling buildings, as follows:

*Exterior Painting of Dwelling Buildings*

| Type of building | Number of each type | August 11, 1959 | | September 15, 1959 | |
|---|---|---|---|---|---|
| | | Per building | Total for type | Per building | Total for type |
| A | 42 | $327 | $13,734 | $294 | $12,348 |
| B | 190 | 237 | 45,030 | 213 | 40,470 |
| C | 25 | 415 | 10,375 | 373 | 9,325 |
| D | 13 | 438 | 5,694 | 394 | 5,122 |
| F | 40 | 125 | 5,000 | 112 | 4,480 |
| H | 60 | 168 | 10,080 | 151 | 9,060 |
| Totals | | | | 89,913 | | 80,805 |

Defendant points out quite correctly that the percentage reductions of the subcontractor's figures for interior painting, as set forth in the first table above, closely parallel the reductions for exterior painting, as set forth in the second table, with the reductions averaging 10.7 percent on the interior painting of

the dwelling buildings and 10.1 percent on the exterior painting of the same buildings. Since the exterior painting is in no way related to the dispute over the contract specifications involved in this case, defendant argues in effect that this court should reject Mr. Allen's testimony that he reduced his estimates on the pertinent interior painting because under his interpretation of the specifications, previously unpainted plaster surfaces were not to be painted. Defendant argues that it is not worthy of belief that "only the reduction in the interior painting estimate was caused by specification interpretation while presumably the reduction of the same amount in the exterior painting estimate was caused by competitive factors."

■ The Board, however, included in its statement of facts the following:

* * * When Mr. Allen prepared his original bid estimate, based on a "take off" from the contract plans, he included the disputed surfaces in his bid estimate. However, when he visited the job site and inspected the buildings on the day before the bid opening, he discovered that the following surfaces were unpainted, having been left unpainted when the Wherry Housing was built some 8 years before: plaster ceiling of residential units in all rooms except bathrooms and kitchens; plaster walls and ceilings in interior closets of all residential units; plaster walls and ceilings of carport storage rooms in some units. Thereupon, he revised his bid estimate downward to reflect the exclusion of the square footage of surface he had discovered to be unpainted, as the specifications were interpreted by him as not requiring the initial painting of previously unpainted existing surfaces. On the night before the bid opening he gave appellant a price quotation based on his revised estimate, showing a lump sum reduction below his previous quotation without any revision of unit prices.

Although Mr. Allen's report to his superior at the time indicates that he regarded his revised bid estimate as being on the liberal side, we are convinced that he did not include the previously unpainted plaster surfaces in the square footage which he used as the basis for his revised bid estimate. The record does not show whether or the extent to which appellant based its bid on the reduced price quotation which Mr. Allen gave appellant on the night before the bid opening.

Mr. Allen's testimony before the Board clearly supports the Board's ultimate finding that he reduced his bid estimates because of his interpretation that the previously unpainted surfaces were not to be painted. While Mr. Allen was only superficially examined in his testimony before the Board on the matter of the comparative reduction of his estimates on exterior and interior painting, nevertheless the Board had before it the August 11, 1959, and September 15, 1959, computations of this witness, and it cannot be concluded that the Board erred in deciding that his testimony was credible that he reduced his interior painting estimates because of his interpretation, especially in view of the fact that the August 11, 1959, work sheets disclosed that the computations on the exterior painting were considerably more complicated than those for the interior painting. The parallel reductions could be construed as contrary to Mr. Allen's testimony, but they are not of the nature of an immutable physical, or otherwise incontrovertible fact which would require all reasonable minds to reject such testimony. It is concluded that the Board's finding of fact is reasonable and supported by substantial evidence.

Defendant further contends that "in order for plaintiff to recover it would be necessary to show either that it relied upon Mr. Allen's interpretation or that it interpreted the contract the same way." Defendant submits that "these issues of fact should be decided by the Board and that this Court should suspend its proceedings and refer the issues back to the Board."

As stated in the last above-quoted sentence of the Board's findings, the Board found that its record does not show whether or the extent to which plaintiff based its bid on the reduced price quotation which Mr. Allen gave plaintiff on the night before the bid opening. No agent of plaintiff testified before the Board, but only Mr. Allen and the subcontractor's president. A copy of plaintiff's contract with defendant is part of the certified copy of the Board's record on file herein, but contains only a blank unit price schedule. When defendant filed its cross-motion and supporting brief herein, defendant filed another copy of plaintiff's contract which contains a completed unit price schedule. Plaintiff has stated no objection to consideration thereof, and it is assumed that the completed unit price schedule was before the Board. Based thereon and also on Mr. Allen's September 15, 1959, breakdown of the subcontract price, the following tables compare Mr. Allen's revised bid on each type of dwelling building (including all such buildings) with plaintiff's corresponding bid to the defendant for the same items of interior and exterior painting:

*Interior Painting of Dwelling Buildings*

| Type of building | Mr. Allen's 9–15–59 breakdown | Plaintiff's bid to defendant | Percentage increase |
|---|---|---|---|
| A | $20,496 | $38,640 | 88 |
| B | 57,380 | 77,900 | 36 |
| C | 15,300 | 19,575 | 28 |
| D | 8,710 | 12,935 | 49 |
| F | 5,600 | 8,920 | 59 |
| H | 9,780 | 13,740 | 40 |
| Totals | 117,266 | 171,710 | 46 |

*Exterior Painting of Dwelling Buildings*

| Type of building | Mr. Allen's 9–15–59 breakdown | Plaintiff's bid to defendant | Percentage increase (decrease) |
|---|---|---|---|
| A | $12,348 | $14,910 | 21 |
| B | 40,470 | 42,560 | 5 |
| C | 9,325 | 11,500 | 23 |
| D | 5,122 | 6,149 | 20 |
| F | 4,480 | 4,600 | 3 |
| H | 9,060 | 8,400 | (7) |
| Totals | 80,805 | 88,119 | 9 |

On the exterior painting of the dwelling buildings (not involved in plaintiff's claim) plaintiff's bid to defendant was 9 percent greater overall than Mr. Allen's breakdown of the subcontractor's bid, with the variations between minus 7 percent to plus 23 percent from one type of building to another. On the interior painting of the same buildings, plaintiff's bid was 46 percent greater overall

than Mr. Allen's breakdown, with variations between 28 percent and 88 percent. Considering the fact that there is no affirmative evidence that plaintiff relied on its subcontractor's bid in making its bid to defendant, and the further fact that plaintiff was not supplied with the subcontractor's unit price breakdown of its lump sum quotation until more than a month after the bid opening, the conclusion seems inescapable, especially when consideration is given to the wide disparity between the plaintiff's and the subcontractor's estimates on interior painting, that plaintiff did not in fact rely on the subcontractor's estimates on the interior painting of the dwelling buildings. It is obvious that plaintiff might well have included the disputed surfaces in its computation of the pertinent unit prices. There is no evidence to the contrary.

█ Assuming that plaintiff did in fact include the disputed plaster surfaces in its unit prices for interior painting, thus employing the same interpretation of specifications claimed by defendant, it would seem that plaintiff has failed to establish an essential element of the subject claim for damages, which is perhaps distinguishable from its basic right to sue for its subcontractor, hereinafter discussed. There is no contrary contention and it must be assumed that plaintiff received the contract unit prices for the interior painting, and if such prices included the disputed surfaces, any further allowance to plaintiff (even though solely for the subcontractor) would be a duplicate assessment against defendant for the same work. However, this issue seems intertwined with, or at least closely related to the issues pertaining to amount of recovery, if any. It must be remembered that damage issues are not before the court. By agreement of the parties, the Board separated such issues and received no evidence or briefs on the amount of recovery.

Sometime shortly after October 1, 1959, the subcontractor commenced performance of the project painting work. By letter dated October 7, 1959, defendant's resident engineer advised plaintiff as to the paint colors to be used (designated by Government specification numbers) on interior painting of the project, specifying such colors as to hallways, living rooms, bedrooms, kitchens, utility rooms, baths, and closets. The letter further stated that "all ceilings will be color No. 37886," and that "Closets leading off a room will be painted the same color as the room." Plaintiff, of course, delivered a copy of this letter to its subcontractor whose Mr. Allen used it to place paint orders with its suppliers. No protest of this letter was made either by plaintiff or its subcontractor to defendant, although such letter obviously contemplated the painting of the disputed plaster surfaces involved in this case.

The subcontractor's job superintendent had available to him on the job site a copy of the contract specifications. In accordance with general procedure, he was expected by the subcontractor to refer only to the painting section thereof as his guide on what to paint. On the first 200 dwelling units, he proceeded to have the disputed plaster surfaces painted. There is no evidence that he requested or obtained any advice or instructions from defendant or anyone else in this respect.

In the period February 15–18, 1960, Mr. Allen visited the project and observed that the disputed plaster surfaces had been painted on the 200 dwelling units. After a preliminary discussion with defendant's head inspector who advised that such surfaces had to be painted, Mr. Allen went to plaintiff's president, who was also its job superintendent, and presented at the job site his complaint that the subcontractor was painting surfaces which shouldn't be painted, and that defendant's inspector had stated they should. According to Mr. Allen, this was the first time the problem had been brought to the attention of plaintiff's president, who at that time reviewed the specifications. At the suggestion of the latter, they then went together to defendant's resident engineer, who confirmed the inspector's statement that the disputed plaster sur-

faces had to be painted. The opposing positions were restated respectively in a claim letter, dated March 24, 1960, written by plaintiff in behalf of its subcontractor to defendant's resident engineer, and in the latter's reply letter, dated April 8, 1960, stating that the specifications required that unpainted plaster surfaces be painted, and that if plaintiff disagreed, it could request a decision of the contracting officer in writing, as provided under the Disputes article of the contract. Plaintiff thereafter exhausted its administrative remedies as above stated. The subcontractor completed the painting of the disputed surfaces as required by the defendant.

▌ Defendant relies upon J. L. Simmons Co. v. United States, 304 F.2d 886, 888, 158 Ct.Cl. 393, 397 (1962), in which the court considered the applicability of the Severin doctrine [1] and collated its prior decisions which "delineated the only grounds upon which a prime contractor may sue the Government for damages incurred by one of its subcontractors through the fault of the Government." The court therein states the general rule to be:

> The decided cases make abundantly clear that a suit of this nature may be maintained only when the prime contractor has reimbursed its subcontractor for the latter's damages or remains liable for such reimbursement in the future.

Defendant contends that plaintiff has the burden of establishing these conditions. There is no evidence that plaintiff has or has not reimbursed its subcontractor the additional costs claimed herein. The pertinent subcontract document was not before the Board and is not before this court, and there is no evidence that it contained or did not contain exculpatory language. In the absence of exculpatory language, suit by the prime contractor in behalf of a subcontractor against defendant will generally be permitted. J. L. Simmons Co. v. United States, supra; Warren Bros. Roads Co. v. United States, 105 F.Supp. 826, 831, 123 Ct.Cl. 48, 84 (1952); J. W. Bateson Co. v. United States, 163 F.Supp. 871, 143 Ct.Cl. 228, 229 (1958); Garod Radio Corp. v. United States, 307 F.2d 945, 947, 158 Ct.Cl. 596, 601 (1962). In each of the last cited cases, except *Garod Radio*, the subcontract (or claimed release) was before the court, and there existed no exculpatory language. *Garod Radio* is a clear precedent for rejection of defendant's contentions. It involved a claim in behalf of a subcontractor for an equitable adjustment under the Changes article of the prime contract, the same type of claim asserted by plaintiff herein, and as in this case, the subcontract was not before the court, and there was no evidence as to whether or not the plaintiff remained liable to the subcontractor for the claimed losses. The court concluded that the plaintiff was entitled to maintain the action for its subcontractor. See also the two recent decisions, both entitled Blount Bros. Constr. Co. v. United States, 346 F.2d 962, 964, 171 Ct.Cl. 478, 482 (June 11, 1965); 348 F.2d 471, 172 Ct.Cl. ——, —— (July 16, 1965).

In denying plaintiff's appeal, the Board concluded that read as a whole, the specifications are clear and unambiguous in requiring the painting of existing interior plaster surfaces, that such an interpretation gives meaning and effect to all the provisions of the specifications and avoids any conflicts in specification provisions, whereas plaintiff's interpretation (that Section 1 is a scope-of-work section which specifies what to paint, and that Section 3 specifies only how to paint) would render Section 3.

---

1. Severin v. United States, 99 Ct.Cl. 435, 442 (1943), cert. denied 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944); Continental Ill. Nat'l. Bank, etc. v. United States, 81 F.Supp. 596, 597, 112 Ct.Cl. 563, 564 (1949); Continental Ill. Nat'l. Bank, etc. v. United States, 101 F.Supp. 755, 758, 5121 Ct.Cl. 203, 244 (1952), cert. denied 343 U.S. 963, 72 S.Ct. 1057, 96 L.Ed. 1361 (1952); Continental Ill. Nat'l. Bank, etc. v. United States, 115 F.Supp. 892, 897, 126 Ct.Cl. 631, 639 (1953).

nugatory and would cause the specifications not to specify any painting to be done except by the indirect process of specifying surfaces to be prepared for painting.

■ The contest of these conclusions by plaintiff raises questions of law to be decided by the court without according finality to the Board's decision thereof. Wunderlich Act, 41 U.S.C. § 322 (1964 ed.); C. J. Langenfelder & Son, Inc. v. United States, 341 F.2d 600, 607, 169 Ct.Cl. 465, 477 (1965); Jansen v. United States, 344 F.2d 363, 368, 170 Ct.Cl. 346, 353 (1965); Morrison-Knudsen Co. v. United States, 345 F.2d 833, 837, 170 Ct.Cl. 757, 764 (1965).

Plaintiff contends that its interpretation of the contract specifications is reasonable, and relies upon the holding of this court in Abe L. Greenberg Co. v. United States, 300 F.2d 443, 446–447, 156 Ct.Cl. 434, 439–440 (1962), that in a dispute over the meaning of contract provisions, it is not necessary that plaintiff's interpretation be correct, but only that it be reasonable under the circumstances involved. Plaintiff also relies upon the rule stated in Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947), that ambiguous contract provisions, susceptible to more than one reasonable construction, will be construed against the defendant as the party who drafted the contract.

Defendant asserts that the specifications clearly and unambiguously require the painting of the disputed surfaces, but assuming that an ambiguity does exist, and further that the subcontractor did in fact rely on his asserted interpretation, the defendant further contends that the subcontractor was required by the terms of the pertinent invitation for bids and a general provision of the prime contract to seek an interpretation from defendant's contracting officer, and having failed to do so, plaintiff and its subcontractor cannot rely on the principle that ambiguities are to be construed against the drafter. In support of this latter contention, defendant cites Beacon Constr. Co. of Mass. v. United States, 314 F.2d 501, 504, 161 Ct.Cl. 1, 6–7 (1963).

The overall specifications are divided into four parts, and Part IV entitled "Technical Provisions" contains all of the language pertinent in this case. Part IV is divided into four groupings called sections, as follows:

| Section No. | Section Title |
| --- | --- |
| 1 | Structural Work |
| 2 | Mechanical Work |
| 3 | Painting, General |
| 4 | Electrical Work, Interior |

Each of these sections contains numbered paragraphs, some of which have lettered subparagraphs. In accordance with this styling, for example, specification 1–05v (quoted below) is subparagraph v under paragraph 5 of Section 1, the "Structural Work" section.

The specifications relied upon by defendant are all contained in Section 3, the "Painting, General" section, and with other pertinent specifications in that section, are as follows:

3–01. SCOPE: This section covers the painting that is itemized hereinafter under SURFACES TO BE PAINTED.

\* \* \* \* \* \*

3–08. SURFACES TO BE PAINTED:

*a. General.* Except as specified under SURFACES NOT TO BE PAINTED, the surfaces listed in the painting schedule herein shall receive the surface preparation, paints, and number of coats prescribed. \* \* \*

\* \* \* \* \* \*

(3) *Prime Coats* specified herein are for new items or items previously unpainted.

\* \* \* \* \* \*

3–09. SURFACES NOT TO BE PAINTED: The following listed items except as noted will not require painting or the application of finish coats:

Exterior precast concrete trim.

Exterior clay brick masonry.

Exposed concrete and asphalt tile floors.

Unexposed interior ferrous surfaces except shop coats as hereinbefore specified.

Ceramic and other pre-finished wall tile.

Hardware items and trim except those primed for painting.

Interior surfaces of community shopping center except new items or repaired areas.

Ferrous surfaces of mechanical equipment and machinery.

\* \* \* \* \* \*

3–11. INTERIOR PAINTING:

*a. General.* Materials within interior spaces unless otherwise specified shall receive paint and enamel to match existing and shall include all exposed wood, ferrous metals, galvanized surfaces, plaster, and similar surfaces. Horizontal runs of overhead pipes, pipe covering and registers, shall be painted the same colors as walls. Concealed piping shall be left unpainted. *No paint shall be applied to the interior of exterior walls until the exterior side of walls, which are scheduled to be painted, have been painted.*

*b. Areas and surfaces to receive paint shall be painted as follows:*

(1) Plaster, Gypsum Board, Composition Fiberboard and Cement Asbestos Board unless otherwise specified.

| | |
|---|---|
| (a) Surface Preparation | As previously specified for each type of surface. |
| (b) 1st Coat | TT – P – 56 (Omit on existing painted surfaces). |
| (c) 2d Coat | TT – P – 47. |

Plaintiff's principal reliance is upon specification 1–05v in Section 1, Structural Work, in which section, specifications 1–01 and 1–05v provide as follows:

1–01. SCOPE: This section covers structural repairs, replacements and improvements described herein.

\* \* \* \* \* \*

1–05. INTERIOR REHABILITATION OF FAMILY HOUSING UNITS: The following interior items of family housing units shall be repaired or replaced as specified hereinafter in an approved manner as directed by the Contracting Officer. Finish painting of all items is covered under Painting Section of these specifications. Shop coats of paint and protective coatings shall be applied under each item as required.

\* \* \* \* \* \*

*v. Painting.* All interior painted surfaces and new interior surfaces specified to be painted under Section,

PAINTING, GENERAL of these specifications shall be thoroughly cleaned of all oil, grease, dirt, rust, loose particles, chipped, cracked or blistered paint and scraped, sanded and otherwise prepared to receive the paint coats and treatments specified. Colors of paint shall be selected by the Contracting Officer from colors listed in Federal Standard No. 595. Interior ferrous metal surfaces shall be painted one prime coat of red lead paint conforming to Federal Specification TT–P–86a(1) immediately after cleaning.

In addition, plaintiff discusses in its brief in support of its interpretation other specifications as hereinafter related.

Considered alone, the above-quoted specifications under Section 3 (Painting, General) clearly require painting of the disputed plaster surfaces. At the commencement of the section, specification 3–01 states that Section 3 covers the painting itemized under "SURFACES TO BE PAINTED," which is the title of specification 3–08, stated as such not only where 3–08 is set forth, but also in the table of contents for Section 3. One notes at the outset that specification 3–08 expressly excludes from its operative language surfaces under "SURFACES NOT TO BE PAINTED," which is the title of specification 3–09, immediately following. A mere scanning of 3–09 re-

veals that plaster (painted or unpainted) is not excluded, except in the shopping center, which contained none of the disputed surfaces. Therefore, specification 3–08 remains applicable, and it provides that "the surfaces listed in the painting schedule herein shall receive the surface preparation, paints, and number of coats prescribed." The described painting schedule (for interior painting) is plainly set forth in specification 3–11, in paragraphs *a* and *b* of which, plaster is listed as a surface to receive paint, with a plaster schedule providing surface preparation and different paints for first and second coats, with the instruction that the first coat was to be omitted "on existing painted surfaces," which latter statement conforms with the provision of 3–08*a* (3) that prime coats are for surfaces "previously unpainted." The obvious conclusion from all of the foregoing language of Section 3 is that the disputed plaster surfaces were required to be painted. Of course, specification 3–11*a* contains the exception "unless otherwise specified" in its requirement that plaster and other items receive paint "to match existing," but this statement does not nullify the plain language that prime and finish coats be applied to unpainted surfaces. One searches Section 3 in vain to find any express exclusion of the disputed surfaces, and the intention remains clear that all plaster surfaces (except the shopping center) were to be painted.

Plaintiff contends that Section 3 (Painting, General) should not be construed as designating what surfaces were to be painted, but only prescribing the manner in which painting was to be done. Plaintiff relies upon the testimony of the subcontractor's president (who had been in the painting business since 1940, and who had had numerous painting contracts on Government projects, totaling over $50,000,000) that defendant's Painting, General specifications are virtually identical on all Government projects, that it was necessary to refer to "either the scope of the work or special conditions pursuant to the contract" to determine what should be painted, and that in this case, he and Mr. Allen relied on specification 1–05*v* as defining the work to be done. In further support of this contention, plaintiff points to the fact that the Painting, General specifications contain references to work which did not exist on the pertinent project, and correctly cites as examples "All steel piping and exposed threads of galvanized piping and electrical conduit run in or through concrete or masonry or buried underground and cut edges of galvanized sheets" in painting schedule (8) and "Asphaltic coated surfaces other than food preparation, shower and latrine areas" in painting schedule (9) of specification 3–11*b*.

Having concluded that Section 3 (Painting, General) is limited to how painting is to be done, plaintiff would remove from consideration all of the above-quoted Section 3 provisions concerning what surfaces are and are not to be painted, including *inter alia* the above-quoted scope specification 3–01 on the painting work. Plaintiff points to the above-quoted scope specification 1–01, stated at the commencement of the Structural Work section, and argues that Section 1 (Structural Work) designated the painting work to be done, but 1–01 obviously limits Section 1 to structural work.

Specification 1–04 of the Structural Work section provides for repair or replacement of roofing, flashing, gutters and downspouts, screens, windows, doors, etc., and contains the statement:

   * * * Painting of all items is covered under Section, PAINTING, GENERAL of these specifications. * * *

Plaintiff points to the different language used in this respect in the above-quoted opening paragraph of specification 1–05:

   * * * Finish painting of all items is covered under Painting Section of these specifications. * * *

and argues that the "Painting Section" mentioned in the last quoted sentence means the above-quoted paragraph *v* of specification 1–05. Of course, under

the clear styling of the specifications, paragraph *v* is not a "section" of the specifications, but plaintiff must and does call it such under its theory advanced in this case.

Plaintiff argues that to conclude that specification 1–05*v* does not designate the painting work to be done, namely, "painted surfaces and new surfaces," would require that one (a) abandon such specification as having no meaning, or (b) interpret it as conflicting with the Painting, General section, contrary to the well established rule of construction that an interpretation which gives a reasonable meaning to all provisions will be preferred to one which leaves a portion of the writing useless or inexplicable. However, the basic difficulty with plaintiff's contention is that specification 1–05*v* does not provide for painting at all, but only specifies the method of preparation of surfaces. It is true, as plaintiff contends, that specification 1–05*v* differs from specification 3–06 in that the former limits the cleaning and preparation of plaster surfaces to "painted surfaces and new interior surfaces" specified to be painted under Section 3, Painting, General of the specifications, whereas specification 3–06 (Cleaning and Preparation of Surfaces) provides generally that "Surfaces to be painted shall be clean before applying paint or surface treatments," and with respect to plaster that "Surfaces shall be dry, clean and free from grit, loose plaster, and surface irregularities before paint is applied." In other words, specification 3–06 in the Painting, General section is reasonably to be construed as covering the cleaning and preparation of both painted and unpainted plaster surfaces, whereas specification 1–05*v* in the Structural Work section covers such work for only painted and new surfaces. However, this discrepancy in cleaning and preparation of surfaces cannot reasonably be held to convert specification 1–05*v* into a statement as to what surfaces were to be painted, in disregard of the plain language of Section 3 to the contrary.

Plaintiff presents the further strained argument that ceilings were not to be painted because the contract unit price schedule contains under "General" items for the dwellings (covering repairs and replacements) the item that for "Ceiling, Plaster," 1 square yard is estimated for repair. Plaintiff then calls attention to paragraph *u* of specification 1–05, providing as follows:

> *u. Plaster.* All designated breaks in plaster walls and ceilings shall be cut out to an inverted "V" shape of width required. Clean off all loose material and dust and thoroughly wet. Remove excess moisture and apply patching plaster to within ¼-inch of surface, allow to take initial set, then level to adjacent surfaces with additional patching plaster. Treat finish surface of patch to match adjacent surfaces. Patching of hair line cracks and nail holes in plaster is covered under Section, PAINTING, GENERAL of these specifications.

The unit price schedule does not contain any unit estimate for repair of wall plaster, although specification 3–06*e* in the Painting, General section requires that "All designated breaks in plastered surfaces shall be repaired with patching plaster, properly keyed to the existing plaster, and sandpapered smooth. Hair line cracks and nail holes shall be filled with a mixture of patching plaster and paint as directed." Plaintiff argues that the specification 1–05*u* requirement to treat the finish surface of a plaster patch "to match adjacent surfaces" has meaning only if construed to provide that patched walls were to be finished to match the painted surface, and that ceilings were to be finished to match the unpainted plaster surface. Otherwise, plaintiff asserts, specification 1–05*u* would not have contained the requirement to treat finish surface of patch "to match existing surfaces," but that sentence would have provided

> * * * Treat finish surface of patch and paint. * * *

Plaintiff argues that repairing of plaster surfaces for walls was included in the

cost of painting, but ceiling repairs were not so covered, and therefore, a special unit price was established. However, the disputed ceilings had a textured (sand finished) plaster finish, whereas the wall plaster was smooth, and the obvious purpose of the words "to match existing surfaces" was to provide that ceiling patches be done with such textured finish, and there is no reasonable basis for interpreting this provision as making a distinction between painting of previously painted and unpainted plaster surfaces, contrary to the plain meaning of the Section 3 provisions.

Plaintiff points to painting schedule (7) in specification 3–11b, concerning preparation of surfaces and painting of conduit runs, ducts, pipes and pipe hangers, louvers, grilles, registers and air outlets, etc., "having painted adjacent surfaces." Plaintiff submits that the quoted words are used in the general specifications only because ceilings are frequently not painted. This phrase, plaintiff continues would have no meaning if the Painting, General Specifications were construed to designate what areas and surfaces were to be painted, since according to specification 3–08, all interior surfaces of whatever nature (plaintiff continues) would be painted, and there would not be any unpainted adjacent surfaces. By plaintiff's admission, however, there were unpainted plaster surfaces in the shopping center, excluded from painting by specification 3–09. Furthermore, subparagraph a of specification 3–11 provides "unless otherwise specified," material within interior spaces shall receive paint, and by the words "having painted adjacent surfaces," specification 3–11b(7) has placed a limitation on the painting of the items therein specified.

In response to a statement in the Board's decision to the effect that unpainted plaster surfaces were required to be painted because they were not "otherwise specified" under Section 3, plaintiff argues that there were many items not listed under SURFACES NOT TO BE PAINTED (specification 3–09), which were not painted and which were obviously not intended to be painted. Plaintiff states correctly that specification 3–09 does not list roofs, bathtubs, sinks, glass in windows or doors, between wall surfaces, attic surfaces, and floor joists. Plaintiff's assertion is accepted that none of these areas was painted on the pertinent project. Plaintiff then completes the circle of its argument by asserting that the reason why these items were not listed in specification 3–09, and were not painted, is because they were not "previously painted" or "new interior" surfaces under the Structural Work section of the specifications. But the reason why such items were not painted is because such items were not listed in any of the painting schedules, as required by specification 3–08, except possibly attic surfaces, and floor joists, as to which it is sufficient to accept plaintiff's observation that it was obvious to any reasonable person that such surfaces, as well as bathtubs, etc., were not to be painted.

In further support of its interpretation, plaintiff also relies on specification 1–06h, providing for cleaning and preparation of exterior surfaces for painting in the rehabilitation of the shopping center, as follows:

h. *Painting.* All exterior painted surfaces shall be cleaned and prepared for painting as specified hereinbefore for exterior surfaces and painted as specified in Section, PAINTING, GENERAL. New interior surfaces shall be painted to match existing. The existing interior surfaces of the building are not to be painted under this contract.

Plaintiff calls attention to the similarity between the last-quoted paragraph and paragraph v (quoted above) of specification 1–05 in that both refer to previously painted surfaces. Plaintiff did not paint existing exterior unpainted surfaces at the shopping center, and defendant accepted it as a finished job. Plaintiff states that it was not required to paint such exterior surfaces because the contract did not call for the painting

of previously unpainted surfaces. Plaintiff also relies on the provision of specification 1–06*h* that existing interior surfaces of the shopping center are not to be painted, which is consistent with specification 3–09, but plaintiff argues that in that respect, 1–06*h* supports its interpretation of the specifications.

However, the exterior surfaces of the shopping center, which were not painted, were aluminum, a non-ferrous metal. Specification 3–10 of the Painting, General section specifies six types of exterior surfaces to be painted, including galvanized surfaces and exposed ferrous metal surfaces, but does not specify any non-ferrous metal surfaces. Plaintiff's answer to this is that the mere fact that specification 3–10 can be used to justify defendant's failure to require plaintiff to paint the exterior aluminum surfaces, does not mean that plaintiff's reliance on Section 1 provisions is unreasonable.

The rule relied upon by plaintiff in the *Greenberg* case, supra, is not applicable in this case. Contracts are not necessarily rendered ambiguous by the mere fact that the parties disagree as to their meaning. There must be a reasonable uncertainty of meaning. Carter Oil Co. v. McCasland, 190 F.2d 887, 890–891 (10th Cir. 1951). The fact that the interpretation placed by plaintiff upon the specifications may be considered conceivable, is not the proper basis for construction of the contract against the author of the language. In Jefferson Constr. Co. v. United States, 151 Ct.Cl. 75, 84 (1960), this court stated:

> * * * The rule of construction against the party drafting the document is necessarily premised upon the basic assumption that the alternative interpretation given by the other party to the alleged ambiguous language is a reasonable one and "in accord with the object in view." L'Engle v. Overstreet, 61 Fla. 653, 55 So. 381, 384. The fact that, by giving words strained or unusual connotations, a certain interpretation might or could be considered conceivable, is not a proper basis for the application of the rule. 12 Am.Jur. § 250.

It has been stated by this court that any word or group of words can be twisted, by strained construction, into an ambiguity. Aero Mayflower Transit Co. v. United States, 162 Ct.Cl. 233, 237 (1963). The provisions of the Painting, General section of the pertinent specifications expressly cover the subject matter as to what areas and surfaces are to be painted or left unpainted, and such section clearly and unambiguously requires painting of the previously unpainted plaster surfaces. Plaintiff attempts to avoid this clear meaning by the strained argument that Section 3 does not mean what it expressly provides, but must be limited in its meaning to prescribing only how painting is to be performed. Thus, plaintiff relies upon provisions in the Structural Work section of the specifications, dealing with cleaning and preparation of surfaces to be painted, and by a strained interpretation, would convert such provisions into statements as to what surfaces were to be painted or left unpainted, contrary to express and plain provisions in Section 3. Plaintiff's interpretation cannot be accepted as reasonable because it would write out of Section 3 the clear provisions to the contrary and would do violence to the whole format of the specifications. Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 976, 169 Ct.Cl. 384, 387–390 (1965).

Since it is concluded that plaintiff's interpretation is not reasonable, the doctrine of *Peter Kiewit,* supra, is not applicable. Nor do the circumstances exist here that plaintiff's interpretation should prevail because it would have been required to search for obscure and latent language bearing out defendant's contentions as to the meaning of the pertinent contract provisions. See WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876, 163 Ct.Cl. 1, 6 (1963).

Of course, all of the terms of the specifications must be considered in interpreting their meaning, but after careful review of all of them, it is concluded that plaintiff's interpretation is unreasonable, and that the specifications

are clear and unambiguous in requiring the painting of the disputed surfaces.

The invitation for bids in this case stated that requests for interpretation of specifications could be made in writing to defendant before the submission of bids, and that every interpretation would be issued as an addendum to the specifications. In this case, there was only a conceivable ambiguity. There existed plain provisions of the contract specifications, obviously contrary to the subcontractor's interpretation, and in reason, the clear language must have been or should have been apparent to plaintiff and its subcontractor before submission of bids. When presented with such an obvious inconsistency, one of significance, plaintiff and its subcontractor should have consulted defendant's representatives, and having failed to do so, plaintiff cannot rely on the principle that ambiguities in contracts written by the Government are held against the drafter. Plaintiff is barred from recovering on this claim. Beacon Constr. Co. of Mass. v. United States, supra.

It is my conclusion that plaintiff's motion for summary judgment should be denied, that defendant's cross-motion for summary judgment should be granted, and that plaintiff's petition should be dismissed.