PASCHEN CONTRACTORS, INC. and Peter Kiewit Sons' Co., Joint Venturers

v.

The UNITED STATES.

No. 451–65.

United States Court of Claims.

Dec. 12, 1969.

Maxwell A. Howell, Washington, D. C., attorney of record, for plaintiff. Richard C. O'Hare and Corcoran, Foley, Youngman & Rowe, Washington, D. C., of counsel.

Edward M. Jerum, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, JONES, Senior Judge and LARAMORE, DURFEE, DAVIS, COLLINS, and SKELTON, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Louis Spector with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 99(c) [since September 1, 1969, Rule 166(c)]. The commissioner has done so in an opinion and report filed on February 27, 1969, wherein such facts as are necessary to the opinion are set forth. Requests for review by the court were filed by both parties and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, with a minor deletion by the court, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff is entitled to recover on Count II, Claim Two, and plaintiff's motion for summary judgment is granted, and defendant's cross-motion denied, with respect thereto. Further proceedings thereon are stayed pursuant to Rule 167 [prior to September 1, 1969, Rule 100] for a period of 90 days to afford the parties an opportunity to obtain an administrative resolution by the General Services Administration Board of Contract Appeals, or by the contracting officer, of the equitable adjustment to which plaintiff is entitled under the "Changes" clause contained in the contract. In all other respects plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition is dismissed.

Commissioner Spector's opinion, as modified by a minor deletion by the court, is as follows:

██ Plaintiff is a joint venture which entered into a contract with the United States, acting through the General Services Administration [hereinafter referred to as GSA], for construction of the United States Courthouse and Federal Office Building in Chicago, Illinois. There are two separate claims involved in this action, each of which has heretofore been denied by the agency's contracting officer, and thereafter on appeal by its Board of Contract Appeals. Each claim hinges upon a proper interpretation of the contract terms, and therefore each essentially involves an administrative decision on a question of law. The administrative decisions are therefore not final [1] and are subject to plenary consideration in this court.[2]

Count I in this proceeding (which was designated GSABCA No. 1196 before the Board) relates to a requirement by the contracting officer that plaintiff

---

1. 68 Stat. 81, 41 U.S.C. §§ 321–322 (1964 ed.).

2. Paccon, Inc. v. United States, 399 F.2d 162, 185 Ct.Cl. 24 (1968).

cover or insulate certain mixed air supply ducts in hung ceiling spaces, at an alleged additional cost of $161,001.79. Count II (GSABCA No. 1265 before the Board) relates to a requirement by the contracting officer that certain hot, cold and mixed air supply ducts in the basement of the building be covered or insulated at an alleged additional cost of $61,690.40. In both instances, plaintiff in effect claims that these requirements were in excess of and beyond contractual requirements properly interpreted, that they therefore amounted to constructive changes within the meaning of the "Changes" clause of the contract, and that plaintiff is therefore entitled to equitable adjustments in contract price under that clause in the amounts claimed.

## GENERAL STATEMENT OF FACTS

The contract called for recirculating air systems employing outside air and recirculated interior air to heat, cool and ventilate the building. Under these systems outside air is drawn into the building through fresh air inlets by fans located in the subbasement where it is mixed with interior air in the ratio of one part outside air to two parts interior air. In accordance with seasonal demand, the air flow is thereafter divided with part being heated by passage through steam coils to a temperature of 87° Fahrenheit, and the remainder passed through chilled water coils to attain a design temperature of 52°.

Heated air leaves the steam coils under high pressure at a velocity of about 5,000 feet per minute and passes through large galvanized metal ducts extending from the subbasement up through the core or center shafts of the building to take-off points on each floor. Chilled air similarly moves at high pressure and velocity in separate ducts to these take-off points, where mixing boxes are located. There, the pressure and velocity is reduced, and the air mixed to provide

a condition on each floor of not over 78° on extreme summer days (95° outdoors), nor less than 70° on extreme winter days (10° outdoors). The mixed air then moves through low pressure ducts where it is emitted through ceiling diffusers into the occupied spaces below.

Some high pressure hot air and cold air is premixed down in the subbasement, and thereafter passes up through a third high pressure duct system in the core or center shafts of the building. Without going to mixing boxes, this premixed air moves directly through its own duct system to individually controlled floor convector units located adjacent to the outside wall of the building, where the convectors themselves serve to reduce the pressure as the air is expelled into the occupied spaces.

These last mentioned high pressure mixed air ducts, and the previously described low pressure mixed air ducts which terminate in ceiling diffusers, are both located on each floor in so-called hung ceiling spaces. A hung ceiling is one suspended by wires and channel iron from the bottom of the concrete ceiling (which is also the floor above). The space between the hung ceiling and the floor above provides a concealed area for the mixed air ducts. In addition, this space is employed as a plenum which acts, in effect, as a return duct for the collection and return of used air from the occupied areas to the subbasement. There part of it is exhausted into the atmosphere, and the rest mixed with fresh outside air for reheating, recooling, and recirculation as above described. For the cooling coils to produce 52° air when it is 95° outdoors, the return air should not exceed 78°.[3]

Under Count I of its petition, plaintiff contends that neither the contract specifications, the physical characteristics and requirements of the system, nor trade usage, required the above described

---

3. Thus permitting the two to one mixture of return air and 95° "fresh" air, so-called, to hit the cooling coils at not more than 84°, the maximum temperature at which these cooling coils can produce 52° air.

mixed air ducts located in hung ceiling spaces to be insulated or covered.

Under Count II of its petition, plaintiff contends that the earlier described high pressure hot, cold and mixed air ducts were to be interior lined with acoustic material [4] from the supply fans in the subbasement to the ceiling of the first floor. To the extent that they were thus interior lined, the specifications did not require exterior thermal insulation or covering. Plaintiff contends that defendant modified the requirement for interior acoustic lining, substantially reducing the length of duct to be acoustically lined, and thereby correspondingly increasing the length of duct requiring the more costly exterior thermal covering.

As a second argument under Count II, relating to only part of the claim, plaintiff further contends with respect to the high pressure *hot* air ducts only, that they did not require exterior covering because they carried air at a design temperature of 87°, a temperature below the minimum 90° requirement of the specifications governing thermal covering.

## COUNT I—HIGH AND LOW PRESSURE MIXED AIR DUCTS IN HUNG CEILING SPACES

Plaintiff observes that these mixed air ducts convey heated air during the winter and cooled air during the summer. Between seasons, it is assumed that air temperature is maintained somewhere between the design extremes of 70° to 78°. In this way, the mixed air ducts discharge air satisfying three basic requirements: Heating, ventilating and air conditioning.

Plaintiff then cites section 74 of the Project Specifications "Nonconducting Covering" which incorporates by reference *Standard Specifications for Nonconducting Covering, Public Buildings Service, General Services Administration,* dated August 1957. Specifically, paragraphs 74–09 and 74–10 of the Proj-

ects Specifications incorporate paragraphs 73 through 81 of the Standard Specification on covering for ventilating and air heating equipment, and paragraphs 82 through 92 of the Standard Specification on covering for air conditioning ducts.

Paragraph 73 of the incorporated Standard Specification provides:

The following air heating equipment (air leaving heaters at 90° F. or over) shall be covered: All supply ducts and apparatus from the fresh air intakes to the discharge outlets * * *.

Plaintiff points out that since "the air leaving the heaters under the instant project specifications attains a maximum design temperature of only 87° F., paragraph 73 does not require duct covering."

Paragraph 74 of the Standard Specification provides:

The following ventilating equipment (air leaving heaters at less than 90° F) shall be covered: Supply ducts and casings from fresh air inlets to supply fan inlet connections; supply ducts in unheated attic spaces and unexcavated spaces * * *.

Plaintiff similarly observes that this would not require covering of mixed air ducts in hung ceiling spaces which serve as return air plenums carrying processed, conditioned air.

Thus, there remains only the air conditioning cycle, which is governed by paragraph 82 of the Standard Specification. Under the general heading "COVERING FOR AIR CONDITIONING DUCTS, ETC.," paragraph 82 provides as follows:

The following shall be covered: All supply ducts, casings, etc., from fresh air inlets to room outlets; return ducts in spaces not supplied with conditioned air. Other return ducts including ducts in hung ceiling spaces between conditioned rooms need not be covered.

---

4. Air moving under high pressure creates a noise problem.

Plaintiff and its pertinent subcontractor testified that it was their unanimous conclusion on the basis of the foregoing that no covering was required for mixed air ducts in hung ceiling spaces. In its brief plaintiff asserts:

> * * * Indeed, it might be more accurate to say that nothing in the specifications stood out with such clarity as to suggest that the supply ducts in the hung ceiling spaces of the Federal Office Building should be considered in any way different then supply ducts similarly located in any other office building.

The arguments which it presents in support of this position can be summarized as follows:

1. Plaintiff directly confronts the relatively recent *Gelco* decision of this court[5] in which the same Standard Specification, paragraph 82 above quoted, was construed contrary to plaintiff's position in this case. In *Gelco*, the court had said:

> * * * This particular Standard Specification did more than simply describe how the work was to be done, or what materials were to be used. Paragraph 82 thereof said flatly: "The following shall be covered: All supply ducts * * *." Nothing could be plainer.[6]

Then plaintiff seeks to distinguish *Gelco* pointing out that it related to a post office, not an office building. In the post office "there was a bona fide physical need for supply duct covering to prevent condensation." Plaintiff cites the opinion in the earlier case to the effect that in a post office there are sudden increases in "load" on the air conditioning, making it difficult to maintain proper temperatures and resulting in the possibility of condensation forming and dripping on the mails and the employees. Moreover, there were no hung ceiling spaces in *Gelco*, and it is these spaces we are concerned with in this case.

With respect to a suggestion contained in *Gelco*,[7] that this paragraph 82 had not heretofore been deemed ambiguous, plaintiff asserts that there have been at least three prior challenges of this specification in cases before the GSA Board of Contract Appeals which did not reach the court.[8] The Board decision in one of these cases *(J. W. Bateson Co.)* is annexed to plaintiff's brief to illustrate that in that case the Board ruled in favor of the contractor after finding the specifications ambiguous.

2. Plaintiff argues "trade practice," pointing out that insulation in this instance serves no beneficial purpose, and in fact is deterimental, since uninsulated supply ducts located in a return air plenum actually assist in preconditioning return air for reuse. In support of this argument, plaintiff cites the testimony of plaintiff's general superintendent, a civil engineer with extensive experience in constructing major projects. Also cited is the testimony of the pertinent sub-

5. Gelco Builders & Burjay Constr. Corp. v. United States, 369 F.2d 992, 177 Ct. Cl. 1025 (1966).

6. A footnote in *Gelco* at this point (369 F.2d at 999, 177 Ct.Cl. at 1035) observes:

> "Plaintiff's attempt * * * to import an ambiguity in paragraph 82 itself as to the supply ducts to be covered must certainly be rejected. There is simply nothing in the structure of that paragraph that could reasonably affect its plain meaning that all supply ducts should be covered. Anyone who could possibly come to a result different from the clear grammar of that paragraph surely should at least have made appropriate inquiry to clear up the doubt in his mind. Until plaintiff so contended here, it does not appear that any contractor or subcontractor had ever previously even hinted at any such alleged ambiguity."

7. See note 6 *supra*, last sentence.

8. Whitlock-Dunn, Inc., No. 1007, Oct. 7, 1963; Jack Picoult, No. 671, Aug. 30, 1963; J. W. Bateson Co., 67–1 BCA ¶ 6265.

contractor's vice president, a mechanical engineer with similar experience, who stated on cross-examination:

> * * * We do not normally insulate ductwork which is located above a ceiling, and paragraph 82 does not call for the ductwork to be insulated above the ceiling. So with the combination of these two, there was no question in our minds.

An independent expert testified that the purpose of insulating cold ducts is to prevent condensation which occurs when warm air strikes a cold surface. (This purpose is implied by paragraph 84 of the Standard Specification.) But this system was designed so that there was relatively little differential between the temperature of the ducts and of the hung ceiling spaces (serving as return air plenums) in which they were located, with the result that condensation could not occur.

In the *Gelco* case, *supra*, trade practice was specifically stated to be irrelevant because that case involved a special purpose building, a post office. But, it is argued, trade practice is most relevant in this case because it involves a typical commercial office building.

3. The bids of other covering subcontractors were in close proximity to those of the successful bidder, indicating that they too interpreted the specifications as not requiring covering of the mixed air ducts in hung ceiling spaces. The claim for this covering ($161,001.79) is almost 20 percent of the total subcontract price of $822,000. In good conscience and equity, it is urged, plaintiff and its subcontractor ought not to suffer this loss.

4. Paragraph 82 of the Standard Specification above quoted, although it refers to "all supply ducts," contains the following exception in the last sentence, which is fully consistent with good trade practice and experience:

> Other return ducts *including ducts in hung ceiling spaces between conditioned rooms* need not be covered. [Emphasis supplied.]

Plaintiff argues that since there were no return ducts in hung ceiling spaces, the spaces themselves serving as return ducts, it interpreted the phrase emphasized in the above quotation to refer to supply ducts. Otherwise the phrase would have no meaning, since there were no ducts other than supply ducts in the hung ceiling spaces.

5. Plaintiff cites the fact that paragraph 82 of the Standard Specification contained in this contract has been rescinded and rewritten in the current version of the GSA Standard, as set forth in Appendix D of plaintiff's brief. Appendix D carries a *Note To Specification Writer*, as follows:

> Insulation may be omitted for exposed ducts supplying air to the space in which they are located provided condensation will not occur and outlet air quantities are adjusted to offset heat gain.

Plaintiff submits that the record clearly establishes without dispute that there would have been no condensation or heat gain in the hung ceiling spaces involved in this contract.

6. Plaintiff urges that its interpretation is a reasonable one, and plaintiff actually construed and bid the contract in accordance with that interpretation. Under established precedent, plaintiff is therefore entitled to have the contract construed in accordance with its reasonable interpretation since the defendant drafted it.

7. Plaintiff finally observes that it had no duty to inquire in this instance, such as would create an exception to the "ambiguity" rule, because paragraph 82 was not patently ambiguous. To plaintiff "the meaning of paragraph 82, and particularly the meaning of its final sentence, is perfectly clear."

Even assuming, arguendo, that the paragraph should have alerted plaintiff to inquire, it urges that there is nothing in the record to disclose that an inquiry would have produced a useful response. Subsequent to this dispute, plaintiff and the same subcontractor submitted bids for construction of a similar federal building in Cleveland, Ohio. Aware of this dispute, plaintiff specifically inquired as to whether or not supply ducts in hung ceiling spaces would have to be covered under paragraph 82 of the same Standard Specification. No answer was received, with the result that the covering was included, the bid was considerably higher than the others, and plaintiff did not get the contract.

Needless to say, defendant counters each of the above summarized arguments. It relies heavily on the *Gelco* decision above-cited,[9] pointing out that Standard Specification paragraph 82 was found, in that case, to so clearly require that all supply ducts be covered that it even served to overcome the confusion created by another "garbled" paragraph in the Project Specifications, a "garbled" paragraph which is incidentally not even present in the instant case.

Defendant further reasons that the reference to "all supply ducts" in the first sentence of paragraph 82 would have been qualified (for example, by the words "in non-conditioned spaces") had it been intended that the exception contained in the second sentence be applied to supply ducts. "Taking the plain meaning of the second sentence," the defendant argues, "it is clear that the exception to the covering requirement in that sentence pertains only to *return* ducts."

The fact that there were no return ducts in hung ceiling spaces does not mean that the sentence therefore applies to supply ducts. Rather defendant reasons, it rendered this sentence of

a standard specification as mere surplusage on this particular project.

With respect to plaintiff's reference to "trade usage," defendant argues that while "evidence of trade usage and custom may always explain or define, it may never *vary* or contradict plain contract language."[10] Moreover, even assuming arguendo that this was a factual situation calling for resort to custom and usage, plaintiff has not sustained its burden of proving such widespread custom and usage as it asserts in this case.

Arguments by plaintiff to the effect that the covering was neither needed nor desirable are irrelevant, the defendant points out, because they do not serve to clarify the meaning of Standard Specification paragraph 82. It is urged that even "if the parties had bargained for work which was unnecessary in the opinion of plaintiffs' expert (significantly, the Board made no finding that it was unnecessary), defendant is entitled to have the plaintiffs perform the work."

The so-called "ambiguity" or *contra preferentum* rule is for application, defendant asserts, only if there is in fact an ambiguity, that is, a writing or drawing susceptible to more than one reasonable interpretation. The only reasonable interpretation possible here was that all supply ducts were to be covered, and the plaintiff's contrary interpretation was not reasonable.

Moreover, defendant continues, the *contra preferentum* rule is not for application in any event, because the wording of Standard Specification paragraph 82 should have created doubts obligating plaintiff to inquire prior to bidding so as to secure clarification.

Turning to the revised paragraph 82 currently being used by GSA, defendant points out that this is an offer of new evidence in aid of interpretation which was not before the Board, and in any event it does not aid in interpreting the

9. Note 5 *supra*.

10. Citing W. G. Cornell Co. of Washington, D. C. v. United States, 376 F.2d 299, 179 Ct.Cl. 651 (1967).

earlier paragraph 82 involved in this contract. The latter provision requires no clarification and "one can only speculate as to what prompted" the revision.

Considering now the issues framed by these arguments, we observe that this is yet another instance in which the incorporation of a standard specification without the revisions necessary to tailor it to a specific project, has resulted in a conflict and apparently in a severe loss. These interpretive issues are not, however, resolved by the subjective test of whether or not the plaintiff was in fact misled, and did in fact suffer a loss, but rather by the objective test of examining the contract langauge to determine whether plaintiff should have, in fact, been so misled.

A number of rules of interpretation have been developed to aid in resolving a conflict such as this. Not untypically, the parties herein cite the same general rules of interpretation, but each to support its respective position.

The court is urged to look to the contract as a whole, and not to overemphasize any particular words or phrases to the exclusion of others;[11] to examine trade custom and practice in determining the intention of the parties;[12] to construe the instrument against the defendant as its draftsman, if plaintiff's interpretation thereof is a reasonable one,[13] and to place a duty of inquiry upon plaintiff if the meaning was unclear or ambiguous.[14]

In the last analysis, the case boils down to whether or not Standard Specification paragraph 82, above quoted, is susceptible to more than one *reasonable* interpretation. In a somewhat different factual context, this court, in *Gelco*,[15] held that it was not, and plaintiff recognizes that it has the burden of distinguishing that case.

■ It has failed to sustain that burden. When read within the factual context of this case, paragraph 82 is, as in *Gelco*, still susceptible to only one reasonable interpretation. As stated in the first sentence of that paragraph, "[a]ll supply ducts" were to be covered. Everything after the semicolon in the first sentence, and in the remainder of the paragraph, quite obviously related to "return" ducts. If, as in this case, there were no return ducts in the hung ceiling spaces, then everything after that semicolon was surplusage insofar as the hung ceiling spaces were concerned. It is too much to suggest that the adjective "supply" should be inferred between "including" and "ducts" when the two immediately preceding references to ducts were explicit references to "return ducts." This would not be a reasonable inference, and it is not elevated to the level of reasonableness by the application of trade practice nor by any of the other rules of interpretation abovementioned.

It follows that Count I of plaintiff's petition should be dismissed.

## COUNT II—HIGH PRESSURE HOT, COLD AND MIXED AIR SUPPLY DUCTS IN BASEMENT

As earlier explained, this Count of plaintiff's petition is supported by two separate and distinct arguments or theories which have, in the Board's decision and in the briefs of the parties, been characterized as separate "claims." This characterization is preserved in this opinion. Claim One, in the alleged amount of $61,690.40, is addressed to all of this Count II and, as earlier mentioned, is for the cost of covering with

---

11. Abe L. Greenberg Co. v. United States, 300 F.2d 443, 446, 156 Ct.Cl. 434, 440 (1962).

12. Gholson, Byars & Holmes Constr. Co. v. United States, 351 F.2d 987, 999, 173 Ct.Cl. 374, 395 (1965); Cornell, note 10 *supra.*

13. Southern Constr. Co. v. United States, 364 F.2d 439, 453, 176 Ct.Cl. 1339, 1362 (1966); WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876, 163 Ct.Cl. 1, 6 (1963).

14. WPC, *supra*; Gelco, note 5 *supra.*

15. Note 5 *supra.*

thermal insulation the high pressure hot, cold and mixed air ducts from the supply fans in the subbasement to the ceiling of the first floor, to the extent that those ducts were not interior lined with acoustic material. Claim Two is for the same covering with respect to the hot air ducts only. It is based on a different argument or theory, and is in the alleged amount of $15,239.34, a sum which is, of course, included within the overall claim of $61,690.40, above stated for Claim One.

### Claim One

It will be recalled from the discussion of Count I, above, that the incorporated Standard Specification entitled "COVERING FOR VENTILATING AND AIR HEATING EQUIPMENT," in paragraph 73, provides that the "following air heating equipment (*air leaving heaters at 90° F or over*) shall be covered: All supply ducts and apparatus from the fresh air intakes to the discharge outlets * * *." [Emphasis supplied.]

Similarly, under the general heading "COVERING FOR AIR CONDITIONING DUCTS, ETC." incorporated Standard Specification paragraph 82 provides that the "following shall be covered: All supply ducts, casings, etc., from fresh air inlets to room outlets * * *."

This Claim One of Count II is concerned with an exception to the above requirements. It is spelled out with respect to ventilating and heating in paragraph 76, and with respect to air conditioning in paragraph 84, as follows:

76. Blocks for covering hot air and ventilating ducts, casings, etc., shall be 1-inch thick * * *. Where sound absorbing linings are installed, insulation thickness may be reduced by an amount equal to the sound lining thickness.

84. Covering for ducts * * * in machine and fan rooms shall be 2-inches thick, and for other ducts 1-inch thick * * *. Where sound absorbing linings are installed, insulation thickness may be reduced by an amount equal to the sound lining thickness. Where factory assembled air handling units are furnished with sufficient internal insulation to prevent condensation no external insulation is required.

Going back to the Project Specifications (as distinguished from the incorporated Standard Specification above quoted), paragraph 73-144a(1) provides that, except as otherwise indicated on the drawings, sound absorbers for air conditioning and ventilating supply ducts shall extend between the fan discharge opening in the subbasement to the first supply duct branch or outlet. The first such supply duct outlet is in the ceiling of the first floor, and consistently therewith, contract drawings 9–H.A.–C.V.–1 and 2 each contain a note to the effect that all supply ducts shall be fitted with acoustical lining as specified, from the apparatus in the subbasement to the ceiling of the first floor.

Moreover, Project Specifications paragraph 73-144g., as amended, provides that sound absorbing lining for medium and high pressure ducts shall be not less than 2 inches thick, which would effectively eliminate the requirement for exterior thermal insulation wherever interior acoustical lining is present.

To round out the provisions pertinent to this claim, Project Specifications paragraph 73-144n. provides as follows:

Factory fabricated sound absorbers may be furnished where field fabricated sound absorbers are specified, *or where acoustical duct linings are specified* or indicated on the drawings, provided they have substantially the same attenuation at 250 cycles per second and substantially the same pressure loss, *and ample space is available.* Field fabricated sound absorbers may be substituted for factory fabricated absorbers under the same conditions. [Emphasis supplied.]

A sound absorber, as referred to in the foregoing paragraph, is not installed

within a duct like acoustical lining. In contrast, it is an item of equipment not unlike an automobile muffler which is installed in place of a portion of the ductwork. For the purposes of this claim, it should be observed that sound absorbers are less expensive to furnish and install than interior acoustical lining, but sound absorbers do not eliminate the basic requirement above quoted for exterior thermal insulation. In contrast, interior acoustical lining does correspondingly eliminate the requirement for exterior thermal insulation, and interior acoustical lining is less expensive to furnish and install than a corresponding area of exterior thermal insulation.

The record demonstrates that when this contract was originally advertised, bids received exceeded available funds. Originally the specifications provided for sound absorbing lining in the supply ducts. Project Specifications paragraph 73–144n. above quoted was then modified as an economy measure to permit the installation of sound absorbers in lieu of sound absorbing lining. Therein lies this claim. It is best summarized by this quotation from the Board's opinion:

> * * * Later, at the time of actual construction it was found that there was inadequate physical space for the installation of factory fabricated sound absorbers. The sub-basement was so jammed with mechanical equipment, ducts, electric lines, steel lines, and plumbing lines, that there was barely room for the covering of the ducts. A factory fabricated sound absorber is larger in diameter than the duct to which it connects. In view of this development, the sheet metal subcontractor was unable to exercise the option of utilizing factory fabricated sound absorbers in lieu of acoustical lining. (Installation of the sound absorbers is less costly.) This was called to the attention of the Contracting Officer, who directed Appellant to line only a portion of the ducts, effecting a reduction in contract requirements. Subsequently, this direction was covered by Change Order No. 305 compensating

Appellant for the lining installed. By virtue of this order, that portion of the ducts that was not internally lined had to be covered exteriorly by the insulation subcontractor. Appellant now appeals on behalf of the insulation subcontractor claiming that since the option could not be exercised, due to no fault of Appellant or its subcontractors, the Government should pay for the exterior covering which was necessitated by reason of limiting acoustical lining to only a portion of the ducts. If the whole of the ducts had been lined, outer covering would not have been required under the terms of the contract.

Plaintiff's claim is not well taken. Its basic obligation to furnish and install exterior thermal insulation was not increased by the above described events, but in fact diminished to the extent that interior acoustical lining was installed. Had plaintiff, in fact, been able to install sound absorbers in place of acoustical lining, the entire run of duct involved in this claim would have required exterior thermal insulation. Therefore if, as plaintiff argues, it had originally contemplated the use of the less expensive sound absorbers, its bid must also have included the entire cost of covering the ducts in question with exterior thermal insulation. Change Order No. 305, mentioned in the foregoing quotation from the Board's opinion, in fact compensated the plaintiff for the increased cost of acoustical lining over sound absorbers, on the theory that the nonavailability of space for installation of the sound absorbers in effect deprived plaintiff of a less costly option. It must be presumed that the Change Order reflected a corresponding credit for the exterior thermal insulation thereby eliminated. But it certainly did not create plaintiff's obligation with respect to the exterior thermal insulation not eliminated by the Change Order. As above illustrated, that obligation was already present.

If, on the other hand, plaintiff argues that it was not already obligated to furnish the exterior insulation, it could base

that argument solely on the premise that it had from the beginning planned to line the ducts throughout with acoustical material. But that argument would effectively destroy the basis for the aforementioned Change Order No. 305, which directed that the ducts be partially lined with acoustical material.

What we really have here is a dispute between subcontractors, an internal dispute which is of no concern to defendant. Plaintiff had engaged different subcontractors to install exterior thermal insulation, and interior acoustical lining. The subcontractor on whose behalf this claim is brought had assumed he would not be required to cover the ducts in question because they would be lined in their entirety with acoustical material. He was wrong in this assumption. Defendant's contract is, however, solely with the plaintiff.[16] Under long-established concepts of privity, defendant was entitled to look to the plaintiff alone for discharge of all of the obligations contained in the prime contract. Installation of exterior thermal covering on the ducts in question was clearly an obligation of this contract,[17] except where a corresponding thickness of acoustical lining was installed. It was up to plaintiff to insure that all of the obligations of its contract were discharged by a proper allocation of its responsibilities among the various subcontractors it had selected for this purpose.

■ Despite the statement above quoted from the Board's decision to the effect that the contracting officer *"directed* Appellant to line only a portion of the ducts"* [emphasis supplied], and the existence of the aforementioned Change Order No. 305 effectuating that change, defendant's counsel in this claim places principal reliance on the argument that plaintiff was not so directed, but rather that the defendant merely concurred in plaintiff's wishes.[18] It is not necessary to examine into the propriety of these arguments in light of the above conclusion that plaintiff's contractual obligation to supply exterior thermal covering was not increased by the above described events, and that it is not therefore entitled to recover on this claim.

### *Claim Two*

In this claim, which relates to exterior thermal covering for only the *hot* air ducts in the basement, plaintiff relies on the above quoted paragraph 73 under the title "COVERING FOR VENTILATING AND AIR HEATING EQUIPMENT" to the effect that covering is required where air leaves the heaters "at 90° F or over." Since it is undisputed that the hot air ducts in the basement carried air heated to a design temperature of only 87° F., plaintiff avers that the requirement to cover them was "[p]erhaps the most conspicuous error of the Board, and certainly the most arbitrary * * *." It notes that the earlier quoted paragraph 74 relates to supply ducts carrying air at less than 90° F., and that paragraph requires covering only "from fresh air inlets to supply fan inlet connections."

In response, defendant urges that these were air conditioning ducts, and therefore governed by the above quoted paragraph 82 under the heading "COVERING FOR AIR CONDITIONING DUCTS, ETC." The Board had concluded that: "The term 'air conditioning' is no longer viewed as meaning mere summer cooling. It covers winter heating also." Webster's definition of air conditioning is cited to demonstrate that

---

16. See Somerset Mach. & Tool Co. v. United States, 144 Ct.Cl. 481, cert. denied, 361 U.S. 825, 80 S.Ct. 73, 4 L.Ed. 2d 69 (1959).

17. The separate issue of whether exterior covering on hot air ducts was required is, of course, the subject of Count II, Claim Two, hereinafter discussed.

18. After filing of the motion papers and briefs herein pursuant to Rules 94–100 [since Sept. 1, 1969, Rules 161–168], defendant's counsel also sought unsuccessfully to amend the answer to assert a counterclaim urging that Change Order No. 305 was void for want of consideration.

it means "controlling the temperature of air" without distinguishing between cooling and heating.

It is defendant's argument which is not very persuasive in this instance. Hot air may be termed air conditioning in the generic sense, but not when the specification writer has gone to the trouble of setting forth explicit and separate provisions governing hot air, ventilating, and air conditioning as was done here in Standard Specification paragraphs 73, 74, and 82, above quoted. Similar distinctions are made on the contract drawings, and, as plaintiff points out, this claim is made for the specific type of covering specified for heating ducts, and not for the type that was separately specified for air conditioning ducts. If defendant's contention had merit, the contracting officer would have required covering hot air ducts throughout the building, and not just to the first floor, the area which is at issue in this claim.

Plaintiff cites the rule that the contract should be read to give reasonable meaning to all of it, and that the heating provisions should not be ignored as if they did not exist.[19] Plaintiff is entitled to a fair reading of the specification which is explicitly applicable to the hot air ducts involved in this claim, and therefore it is entitled to recover on this Claim Two of Count II.

## CONCLUSION

Plaintiff is entitled to recover on Count II, Claim Two, and plaintiff's motion for summary judgment is granted, and defendant's cross-motion denied, with respect thereto. Further proceedings thereon are stayed pursuant to Rule 167 [prior to September 1, 1969, Rule 100] for a period of 90 days to afford the parties an opportunity to obtain an administrative resolution by the Board, or by the contracting officer, of the equitable adjustment to which plaintiff is entitled under the "Changes" clause contained in the contract.[20] In all other respects plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition is dismissed.

19. *Greenberg*, note 11 *supra;* Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 169 Ct.Cl. 384 (1965).

20. United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).